Robert W. GELFMAN, Mark Allen, Ameribank Trust, Shirley Collins, David Derhodes, Fumi Fukada, Mary Rounseville, P.J. Hayes, Shirley Sarpa–Blackburn, Lisa Sarpa Snyder, Thomas E. Tice, Thomas C. Hellman, and Ralph S. Giorgio, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

WEEDEN INVESTORS, L.P., Weeden Securities Corporation, Donald Weeden, Barry Small, Robert Cervoni, Timothy McDonald, Robert Weppler and Stephen Leuthold, Defendants.

Civ.A. No. 18519.

Court of Chancery of Delaware,
New Castle County.

Submitted Aug. 2, 2001.
Decided Aug. 23, 2001.

Pamela S. Tikellis and Robert J. Kriner, Jr., of Chimicles & Tikellis, Wilmington; Lynda J. Grant, of Goodkind Labaton Rudoff & Sucharow, New York City, Robert W. Biederman, of Hubbard & Biederman; D. Ronald Reneker, of Bush Craddock & Reneker, Dallas, TX, of counsel, for Plaintiffs.

Bruce E. Jameson, of Prickett, Jones & Elliot, Wilmington; David E. Nachman and Jeremy R. Kasha, of Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City, of counsel, for Defendants.

## OPINION

STRINE, Vice Chancellor.

This case involves a partnership agreement that provides the general partner with broad power to act even in a conflicted situation, subject only to the very loose constraints of what may be fairly summarized as a subjective bad faith standard. The plaintiffs have filed a complaint alleging that the general partner has breached that agreement and its fiduciary duties by taking action to concentrate ownership of the partnership entirely in the hands of its control persons and other current partnership employees, and to squeeze out all non-employee unitholders, save those "favored"

by the general partner. Not only that, the squeeze-out involves the payment of less than fair value to non-employee unitholders.

In this opinion, I conclude that these acts support an inference that the general partner acted in bad faith to transfer wealth from non-employee unitholders to its control persons, and to arrogate to itself power to pick and choose which unitholders can keep their property, and which get deprived of it at less than fair market value. Furthermore, once the squeeze-out is effected, the general partner reserves the power to exempt its control persons and favored investors in the future from the same rules by which it is now forcing the exit of current non-employee unitholders. Even though the partnership agreement precludes application of the traditional entire fairness standard, it does not exculpate the general partner from liability for acts of bad faith. Therefore, I conclude that the complaint states claims upon which relief may be granted.

## I. *Factual Background*[1]

The plaintiffs are a group of former employees and outside investors, all of whom own units in defendant Weeden Investors, L.P. (the "Partnership"). The Partnership is controlled by its general partner, defendant Weeden Securities Corporation (the "General Partner"). The plaintiffs have also sued certain members of the General Partner's board and top management.

The Partnership is in the broker-dealer business.[2] In 1986, the Partnership took its current structure. At that time, the former employees and shareholders of the Partnership's corporate predecessor exchanged their shares for "Basic Units" of the Partnership. In order to raise $10.5 million in capital, the Partnership also sold Basic Units to investors who were not employees or directors of the General Partner. These "Outside Investors" were allegedly told that they would eventually obtain liquidity for their Basic Units, when the Partnership made an initial public offering within the ensuing decade.

In the meantime, the Outside Investors and other holders of Basic Units had important contractual protections. By the terms of the "Partnership Agreement" (or the "Agreement"), Basic Units were not redeemable unless the General Partner owned over 90% of all units. *In the event of such a redemption, the Partnership had to pay the holders the fair market value of their units.*[3] Basic Units were also freely transferable, and holders were entitled to a share of any distributions made by the Partnership.

From 1986 to 1992, the Partnership thrived. The fair market and book values of Basic Units reflected this health, and unitholders received substantial distributions of profits. During this period, the General Partner took actions in accordance with its view that the bulk of the Partnership's Basic Units should be held by employees. This philosophy apparently reflected the belief of the Partnership's driving force, Donald Weeden, that the employees were the key to the Partner-

---

1. The facts set forth are those alleged by the plaintiffs.

2. The Partnership actually has no operations, but wholly owns an operating company. For the sake of simplicity, I ignore this distinction, which is not germane to this decision. Similarly, when I refer to employees or management, I refer to employees or management of the General Partner or the Partnership's operating entity, without distinction as to the precise entity for which they work. When I refer to directors, I refer to directors of the General Partner.

3. Partnership Agreement § 17.1.

ship's success in the broker-dealer business. As a result, Weeden wished to use the Basic Units primarily as a tool to motivate and reward current employees. During the period 1986 to 1992, the General Partner implemented this philosophy through non-compulsory means. When an employee would leave the Partnership's payroll, the Partnership would offer to buy her units for book value. Although this tool worked to some extent, it was at best an incomplete answer. Because the Basic Units were freely transferable and the Partnership was prospering, departing employees also found it attractive to keep their units or to sell them to other purchasers at the higher market, rather than book, value. As a result, over time a large majority of the Basic Units ended up in the hands of Outside Investors, a group that I define as also including former employees who own Basic Units but as excluding certain "Favored Investors" hereinafter described.

In 1992, the General Partner recognized that the features of the Basic Units made it impossible for the Partnership to control the ownership structure of the Partnership or to provide as strong an incentive for employee retention as the General Partner desired. That year, the General Partner therefore caused the Partnership to issue a new class of units, "Class A Callable Units" or "Callable Units." As their name suggests, the Callable Units could be redeemed at any time for book value and were not transferable without the General Partner's consent. The General Partner retained discretion to redeem any or all Callable Units held by particular holders. According to plaintiffs, the Callable Units thus gave the General Partner "a conve-

nient mechanism for eliminating the equity holdings of any person or employee who fell out of favor with management."[4] Put less pejoratively, the use of Callable Units rather than Basic Units as an employee compensation tool gave the General Partner much greater leverage to encourage increased effort, discourage employee departures, and secure fidelity to management on any contested votes.

The creation of Callable Units initiated a series of steps that the General Partner took to concentrate ownership of the Partnership in the hands of current employees and directors. In 1993, the General Partner caused the Partnership to make a distribution equal to 10% of the capital account of each unitholder (the "1993 Distribution").[5] In connection with this return of capital, current employees and directors of the Partnership, and certain Outside Investors and former employers allegedly "favored" by management (*i.e.*, Favored Investors), were given the opportunity to subscribe for additional Callable Units at book value (the "1993 Subscription Plan"). The Distribution obviously gave them some liquidity to exercise that option.

The Outside Investors were not given the option to buy Callable Units. As a result, the percentage of Partnership equity held by current employees, directors, and Favored Investors increased while the percentage held by Outside Investors decreased.

After the 1993 Distribution, the Partnership's success continued. At the end of both 1997 and 1998, the Partnership again made sizeable capital distributions of 10% and 50% respectively (the "1997" and

---

4. Am. Comp. ¶ 53.

5. At oral argument, there was much discussion about how this distribution was calculated. While the answer was unclear, the plain-

tiffs and defendants agreed that the plaintiffs' claim does not turn on how the distribution was calculated.

"1998 Distributions"). Once again, current employees and directors, and Favored Investors were given the opportunity to purchase Callable Units (the "1997 and 1998 Subscription Plans"). The Outside Investors were not.

As a result of the 1993, 1997, and 1998 Options, ownership of the Partnership shifted dramatically. Whereas 70% of the Partnership used to be owned by non-employees, by November 1999, the Partnership's management and employees owned over 87% of the Partnership. According to the complaint, the overwhelming bulk of that 87% was owned by directors and top management of the General Partner, who are "Affiliates" of the General Partner within the meaning of the Partnership Agreement.[6] Indeed, the individual defendants named in the complaint are alleged to have increased their ownership to 34% of the Partnership's total equity by the end of 1999.[7] The plaintiffs further allege that this shift in ownership diluted the Outside Investors' interests in the Partnership, greatly reduced the value of their capital accounts, and supposedly injured the fair market value of their holdings. This is so, they claim, in part because this shift reduced the Outside Investors to minority holders in a Partnership firmly controlled by the General Partner and its Affiliates.

Having shifted the capital structure of the Partnership to ensure that the Affiliates owned a firm majority of the Partnership's units, the General Partner decided to go ahead and complete the job. In November 2000, the General Partner proposed amendments to the Partnership Agreement to accomplish the ultimate end of giving the General Partner the discretion to eliminate all non-employee ownership of Partnership units.

The most important feature of these amendments was a provision converting all Basic Units into Callable Units (the "Conversion" or "Conversion Amendment"). This provision eliminated the protections against compelled redemption enjoyed by Basic Unitholders, and gave the General Partner discretion to cash them out at book value, a price level the General Partner admitted was far less than fair market value in the following disclosure to the Unitholders:

> The book value of Class A Callable Units is unlikely to represent fair market value. In accordance with generally accepted accounting principles, the Partnership carries the majority of its assets at market value (such as securities inventories); however, it also carries some assets on its books at historical cost, as adjusted for depreciation and amortization. Certain assets, such as computer hardware and equipment, may have fair market value substantially lower than book value. Other assets, such as the Partnership's office building in Greenwich, Connecticut, have a fair market value substantially higher than book value. Similarly, the going concern value of the Partnership, assuming the continued ability of the Operating Partnership to retain and attract qualified key personnel (none of whom currently has a written employment agreement), may far exceed book value. Consequently, the price to be received upon redemption of Class A Callable Units at book value is likely to be less than the fair market value of those units.[8]

---

6. Partnership Agreement at A–4.

7. This allegation like many others, is made in plaintiffs' brief, not the complaint.

8. Kasha Aff. Ex. 2, at 4.

At the same time it proposed the Conversion Amendment, the General Partner also announced its intention to implement the "Compelled Redemption Program." Under this Program, the General Partner plans to redeem all the Callable Units held by an employee with less than five years experience at book value on December 31st of the year of her departure. The Compelled Redemption Program sets forth a schedule of redemptions for employees with longer periods of service, which contemplates the redemption of 20% of the employees' holdings each December 31st after severance. If an employee leaves and goes to work for a competing firm within three years of departure, the employee's units are subject to immediate redemption. And because the Program was designed to apply retroactively, employees who departed more than five years before its inception are subject to having all of their units redeemed immediately. Outside Investors who never worked for the Partnership are also subject to immediate redemption. Consistent with its past approach, however, the General Partner retains the discretion not to redeem particular holders' units, thus enabling it to treat Favored Investors better than others. The General Partner also retained the more general discretion to modify the Program at any time.

The Compelled Redemption Program contemplates that holders would be offered book value. *As of the time of the Program's announcement, book value per unit was approximately $4.20, according to plaintiffs' brief. This compares to profit distributions of over $11 per unit made in 1998, 1999, and 2000 by the Partnership,* again according to plaintiffs' brief rather than the complaint.

The plaintiffs contend that the Compelled Redemption Program is an unfair and self-interested one, in which the current management and employees of the Partnership deprive the Outside Investors of their units for a sub-market price. In essence, the plaintiffs contend that the current management and employees have simply decided to transfer wealth from the Outside Investors to themselves.

The plaintiffs allege that the Compelled Redemption Program had a coercive effect on the Conversion Amendment approval vote. According to plaintiffs' brief, all employees of the Partnership serve at will. Given this and the vast discretion the General Partner proposed for itself under the Compelled Redemption Program, the plaintiffs assert that all employees felt pressure to vote with management on the Conversion Amendment vote.

Under the Partnership Agreement, the Conversion Amendment to the Agreement required approval only of a majority of all unitholders (Basic and Callable) voting together. Because the Conversion affected the Basic Unit holders' interests so importantly, the General Partner conditioned the Amendment's adoption on approval by the Basic Unitholders voting separately as a class. Seventy-six percent of the Basic Unitholders ultimately voted in favor of the Amendment – a figure that the plaintiffs allege is equal to the percentage of Basic Units held by current employees. Moreover, the plaintiffs allege that certain Outside Investors of Basic Units received unspecified threats from the defendants, which led those holders to capitulate and cast a yes vote against their self-interest.

## II. The Amended Complaint's Numerous Deficiencies

■ As plaintiffs' counsel admitted at oral argument, the amended complaint less than coherently set forth plaintiffs' position and failed to plead several important facts that were contained in the plaintiffs' brief on this motion. Had this motion

been filed after the effective date of the recent amendment to Court of Chancery Rule 15,[9] the plaintiffs' failure to amend in response to the defendants' opening brief might have been injurious to their cause.

In any event, the parties agreed at oral argument that the court should decide this motion based on those issues fairly raised in plaintiffs' papers on this motion. To the extent that the plaintiffs' ability to survive this motion turns on its ability to plead facts now contained only in its brief, dismissal will not be ordered so long as the plaintiffs file a second amended complaint within the time frame required by this court.

When their various arguments are pieced together, the plaintiffs argue that the defendants' actions violated various provisions of the Partnership Agreement, as well as the defendants' fiduciary duty of loyalty. The plaintiffs further contend that the provisions of the Partnership Agreement contain no exculpatory provisions or safe harbors that insulate the defendants from liability for their actions. The plaintiffs do acknowledge, however, that their challenge to the 1993 Distribution and the 1993 Subscription Plan is barred by the doctrine of laches and should be dismissed.[10]

■■■ The plaintiffs' claims will be examined in light of the well-settled standards for the resolution of a Rule 12(b)(6) motion. Under those standards, the court must accept all well-pled allegations of the complaint as true and draw all reasonable inferences from the complaint in favor of the plaintiffs. The court need not, however, give weight to conclusory allegations of fact or law. If after applying these evidentiary principles it appears with reasonable certainty that the facts set forth in the complaint would not support a recovery under any theory of law or equity, the complaint may be dismissed.[11]

## III. The Structure Of The Partnership Agreement

The Partnership Agreement is in a form familiar to members of this court. Its drafters clearly recognized that 6 Del. C. § 17–1101(d) gave them the right to restrict the fiduciary duties that, as a default matter, govern the General Partner and its directors in managing the Partnership. Rather than sweeping away all default fiduciary duties in one clear section of the Agreement and replacing those duties with a consistent contractual standard, however, the drafters took a more (shall we say) textured approach.

This approach is primarily set forth in §§ 6.10 and 6.11 of the Agreement, which read as follows:

6.10 Liability of the General Partner. (a) *Neither the General Partner nor the*

---

9. *See* Ct. Ch. R. 15(aaa), which states:
 Notwithstanding subsection (a) of this Rule, a party that wishes to respond to a motion to dismiss under Rules 12(b)(6), 12(c) or 23.1 by amending its pleading must file an amended complaint or a motion to amend in conformity with this rule no later than the time such party's answering brief in response to the Rule 12(b), 12(c) or 23.1 motion is due to be filed. In the event a party fails to comply with this requirement and the Court concludes that the pleading should be dismissed under Rule 12(b)(6), 12(c) or 23.1, the dismissal shall be with prejudice unless the Court for good cause shown shall find that dismissal with prejudice would not be just under all the circumstances.

10. *See* Plaintiffs' Br. at 32 (conceding that their challenge to actions that occurred before November 21, 1997 are time-barred).

11. *E.g., Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985); *Solomon v. Pathe Comm. Corp.,* Del.Supr., 672 A.2d 35, 38 (1996).

partners or shareholder, *directors, officers*, employees or agents *of the General Partner shall be liable to* the Partnership, Limited Partners, Assignees or to any Persons who have acquired interests in the Units, whether as Limited Partners, Assignees or otherwise, *for errors in judgment or for any acts or omissions taken in good faith.*

(b) The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the General Partner shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the General Partner in good faith.

6.11 Resolution of Conflicts of Interest.

(a) *Unless otherwise expressly provided herein,* (i) *whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Limited Partner or any Assignee, on the other hand,* or (ii) whenever this Agreement or any other agreement contemplated herein or therein provides that the General Partner shall act in a manner which is, or provide terms which are, fair and reasonable to the Partnership, the Operating Partnership, any Limited Partner or any Assignees, *the General Partner shall resolve such conflict of interest, take such action or provide such terms considering, in each case, the relative interests of each party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles. In the absence of bad faith by the General Partner, the resolution, action or terms so made, taken or provided by the General Partner shall not constitute a* *breach of this Agreement* or any other agreement contemplated herein or therein.

(b) *Whenever in this Agreement or the Operating Partnership Agreement the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Operating Partnership, the Limited Partners or the Assignees,* or (ii) in its "good faith" or under another express standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement, the Operating Partnership Agreement or any other agreement contemplated herein or therein. *Each Limited Partner* and Assignee *hereby agrees that any standard of care or duty imposed in this Agreement,* the Operating Partnership Agreement or any other agreement contemplated herein *or under the Delaware Act or any other applicable law, rule or regulation shall be modified, waived or limited in each case as required to permit the General Partner to act under this Agreement,* the Operating Partnership Agreement or any other agreement contemplated herein *and to make any decision pursuant to the authority prescribed in this Section 6.11(b) so long as such action or decision does not constitute gross negligence or willful or wanton misconduct and is not reasonably believed by the General Partner to be inconsistent with the overall purposes of the Partner-*

*ship.*[12]

■ These provisions have a head-spinning quality upon first reading. After a close examination, the provisions can be parsed to have a somewhat odd, but I think discernible, meaning that is best illustrated by an example. Assume that the General Partner takes an action that would ordinarily be governed by a "sole and complete discretion" standard, such as a decision (as is pertinent here) to issue additional Callable Units. Further posit, though, that the General Partner decides to issue Callable Units to "Affiliates" and employees and not to other unitholders.

The initial question posed is how to reconcile § 6.11(a) and § 6.11(b). On the one hand, § 6.11 seems to be implicated because a conflict is involved. If so, this would mean that the General Partner had a duty to consider several factors in resolving the conflict. On the other hand, § 6.11(b) seems to sweep away inconsistent contractual standards – including those set forth in § 6.11(a) – when the "sole and complete" discretion standard applies. Does § 6.11(b) mean that a General Partner may act in a "conflict" situation under a standard by which it need not – *as a contractual matter* – consider the interests of the limited partners? I conclude so. However harsh it may sound, this is in fact the only reasonable reading of the Agreement. By its terms, § 6.11(b) indicates that other contractual standards – such as those contained in § 6.11(a) – give way and are of no force and effect when the Agreement subjects certain action of the General Partner to an "express" sole and complete discretion standard.

■ The next question is what effect § 6.11(b) has on the General Partner's fiduciary duties. Section 6.11(b) states that

default principles of law – such as principles of fiduciary duty law – "shall be modified, waived, or limited in each case" so as to permit the General Partner to act under the Agreement. This language requires the court, in this example, to determine whether the application of the traditional duty to act fairly in a conflict situation and prove a fair result somehow impedes the General Partner's contractual right to act under the sole and complete discretion standard. This inquiry is further complicated by the fact that the General Partner's authority to act under the "sole and complete discretion" standard is checked by a contractual "Proviso," which states that the waiver of any default legal duties applies "so long as [the General Partner's action pursuant to the sole and complete discretion standard] does not constitute gross negligence or willful or wanton misconduct and is not reasonably believed by the General Partner to be inconsistent with the overall purposes of the Partnership."[13]

The protective Proviso is baffling in certain respects. For one thing, it is rather odd that a section of an Agreement purporting to allow the General Partner to act under a very flexible standard (sole and complete discretion) would then subject the General Partner to liability under the default fiduciary duty of care, albeit under a lax gross negligence standard. Perhaps even more difficult is the last phrase of the Proviso. As I understand that phrase, a General Partner cannot take comfort in the sole and complete discretion standard if the General Partner: (i) formed a reasonable belief that (ii) its actions were inconsistent with the overall purposes of the Partnership. I reach this conclusion by turning the negatively worded Proviso

---

**12.** Partnership Agreement §§ 6.10, 6.11 (emphasis added).

**13.** *Id.* at § 6.11(b).

phrase into a positive one. Having done so, it is not at all clear how the phrase differs from a bad faith standard.

Read this way, the Proviso checks the General Partner's discretion by providing a backstop standard of care and loyalty, which limits the General Partner's insulation from liability under default principles of fiduciary duty in certain situations when its actions: (i) constitute gross negligence; (ii) willful or wanton misconduct; or (iii) are not "reasonably believed to be inconsistent with the overall purposes of the Partnership." The Proviso can be harmonized with § 6.10 of the Agreement, which purports to limit the General Partner's liability for "errors in judgment or for any acts or omissions taken in good faith." The Agreement can be read as distinguishing between liability for simple negligence (*i.e.,* "errors in judgment") and gross negligence (*i.e.,* an extreme departure from the expected standard of care), allowing liability for the latter, but not the former. Likewise, § 6.10's insulation from liability for acts in good faith is consistent with § 6.11(b)'s retention of liability under default law for purposeful misconduct, as reflected in the last two elements of the Proviso.

Although the Agreement therefore does not wash away all the General Partner's fiduciary duties, § 6.11(b) clearly precludes the application of *all aspects of* the traditional fiduciary duty of loyalty when the General Partner is subject to the sole and complete discretion standard. That section substitutes a different standard for the default duty of fairness that would otherwise apply to a conflict transaction.[14] Under that substitute standard, the General Partner will not be liable for breach of

contract or fiduciary duty simply because the result its action produces is not "entirely fair." In lieu of an objective fairness standard, the Agreement substitutes a primarily scienter-based standard of loyalty that depends on a showing that the General Partner either engaged in "wanton and willful misconduct" or acted in bad faith (*i.e.,* that the General Partner believed that its actions did not advance a proper Partnership purpose). The General Partner can also be liable under the substitute standard if its actions constituted gross negligence.[15]

As this example is implicated directly in this opinion, I apply the foregoing analysis in resolving several of the issues the complaint raises.

## IV. *Does The Amended Complaint State A Claim?*

For the sake of simplicity, I will address each of the plaintiffs' claims on a transaction by transaction basis, which considers whether the plaintiffs have stated a claim that the transaction violated either the Agreement and/or any applicable fiduciary duties.

A. *Does The Amended Complaint State A Claim That The 1998 And 1999 Distributions And Subscription Plans Were Contractually And Fiduciarily Improper?*

1. *Does The Complaint State A Claim That The General Partner Lacked The Contractual Power To Distribute Capital?*

■ The plaintiffs' first challenge to the 1998 and 1999 Distributions of · capital made by the General Partner is that those

---

14. This is also the case in situations when § 6.11(a) applies.

15. In this respect, its contractual liability exposure is arguably identical to that which applies under default law. *See* 6 *Del. C.* § 17–403(b); 6 *Del. C.* § 15–404(c).

Distributions were contractually improper, regardless of their purpose or effect. That challenge, however, finds no support in the Partnership Agreement. Section 5.3(a) of the Partnership Agreement states:

> Subject to Section 5.3(b), *the General Partner may from time to time in its sole discretion cause the Partnership to distribute cash,* Units (subject to the requirement that only Basic Units may be distributed in respect of Basic Units and only Incentive Units may be distributed in respect of Incentive Units) *and/or other property to the Partners* substantially in accordance with their respective shares of net income allocated to their Capital Accounts pursuant to Section 5.1 as of the end of the calendar quarter preceding the date of distribution, or if there is no such net income, in accordance with their respective Percentage Interests as of the end of such calendar quarter.[16]

Section 6.1(a)(v) also states that the General Partner has power to distribute Partnership "cash."

In response to this explicit contractual authority, the plaintiffs argue that other provisions of the Agreement somehow implicitly preclude a distribution of partnership capital. But these provisions address how distributions should be made (*i.e.,* § 4.5) and the return of capital in the event of a liquidation (*i.e.,* § 14.3), and are in no way inconsistent with the proposition that the General Partner may return capital so long as it does so in accordance with

the Agreement's general formula for the making of distributions. In this regard, the plaintiffs disavowed at oral argument any intent to argue that the Distributions as made were not in compliance with the formula set forth in the Agreement.[17] Furthermore, sections of the Agreement — § 4.7 and § 7.4 — that indicate that limited partners have no right to a return of capital can be read as implicitly recognizing that the General Partner reserved the power to return capital, but could not be compelled to do so, except in the event of a liquidation.

2. *Does The Complaint State A Claim That The 1998 and 1999 Distributions And Subscriptions Plan Were Violative Of The Proviso And Thus Improper?*

■ The plaintiffs' more heartfelt challenge to the Distributions is based on the instrumental role those Distributions played with respect to the Subscription Plans. The Distributions themselves did not discriminate between Affiliates, employee unitholders, and Favored Investors, as one class, and Outside Investors, as another. All unitholders apparently received Distributions in accordance with the contractual formula, which is based on the value of their respective capital accounts. What the plaintiffs really complain about is that Affiliates, employee unitholders, and Favored Investors were given the option to invest their Distributions in new Callable Units, and that Outside Unitholders were excluded from that opportunity.[18]

---

**16.** Partnership Agreement § 5.3 (emphasis added).

**17.** A contrary position was taken in plaintiffs' brief. A long discussion at oral argument resulted in both parties concluding that this issue was not material to this litigation. In this respect, I note that neither the complaint nor the plaintiffs' brief sets forth facts that support the inference that the Distributions

were made on a basis that did not comply with the contractual formula.

**18.** The plaintiffs do make one other technical challenge to the Distributions and Option Plans. They contend that the Distributions violated § 5.3's requirement "that only Basic Units may be distributed in respect of Basic Units ..." The plaintiffs allege that the Distributions to Affiliates, employees, and Favored

The plaintiffs allege that the General Partner's decision to permit only current employees, directors, and certain select unitholders to subscribe for new Callable Units with the Distributions they received was a breach of the Agreement and a breach of fiduciary duty. In support of this contention, the plaintiffs contend that the Subscription Plans involved a conflict between Affiliates of the General Partner (*i.e.*, its managers and directors), who had an interest in arrogating more of the Partnership's equity to themselves and Favored Investors, and the interests of most Outside Investors. As such, the plaintiffs contend that the conflict resolution requirements of § 6.11(a) came into play.

My analysis of whether the complaint states a claim that the Subscription Plans were improper begins with the easy issues. Initially, there is no question but that the General Partner has the contractual power under § 4.3 to issue new Callable Units to employees, directors and other persons it selects. Indeed, it appears that the best reading of the Agreement is that the Gen-

eral Partner has the "sole and complete discretion" to decide who shall be eligible to buy new units.[19] Furthermore, § 4.4 provides that none of the limited partners possess any preemptive or preferential right with respect to the issuance or sale of units. Thus, § 4.4 makes clear that the mere fact that the Subscription Plans were not open to all unitholders does not, in itself, render those Plans contractually improper.[20]

Given the operation of § 6.11(b), the plaintiffs must plead facts that suggest that the General Partner acted in a manner prohibited by the Proviso. This is a tough standard. However, I find that the plaintiffs have pled facts that suggest that the General Partner's decision to implement the Subscription Plans was made in bad faith and therefore impermissibly under the Proviso.

The complaint alleges that the General Partner consciously decided to shift ownership of the Partnership in a massive way towards Affiliates, current employees, and

Investors were pretextual distributions of "Callable Units" in respect of "Basic Units" and thus improper. This is not so, however. Cash, not Callable Units, was given out in the Distributions. The Subscription Plans then gave certain recipients the option, but not the duty, to use that cash (or other funds) to purchase additional Callable Units. While this may have been contractually improper depending on the General Partner's state of mind, it is not because the Partnership Agreement flatly precludes action of the type taken here.

**19.** This presents a nice interpretative question. The last sentence of Section 4.3(a) clearly gives the General Partner sole discretion to determine "the consideration and terms and conditions with respect to any future issuance of units." Section 4.3(b) also gives the General Partner sole discretion to create new classes of units. But the first sentence of § 4.3(a) states that the General Partner has authority to issue units to itself or others, but does not expressly state that the

General Partner has sole discretion to do so. Is the decision to whom to issue units a "term" or "condition" as referenced in the second sentence of § 4.3(a)? In the case of Callable Units, the question is answered, not by § 4.3(a), but by the Certificate of Designations for that class of Units, which expressly gives the General Partner sole discretion to determine the recipients of such units.

**20.** The defendants would go further. They argue that § 4.4 precludes any claim by a limited partner that the General Partner has taken unfair dilutive action. This argument puts too much weight on a standard form provision of partnership agreements. The fact that the Agreement contains a provision that says that limited partners do not have a right to participate in every issuance and to thereby retain their proportionate ownership in every instance does not mean that the limited partners may never complain about the dilutive effect of any issuance, however ill-motivated.

Favored Investors, and away from most of the non-employee unitholders. In particular, the complaint alleges that Affiliates of the General Partner received most of the new Callable Units. As one would expect, the defendants allege that this move was done in good faith to benefit the Partnership, because it was necessary to provide incentives for employees to stay with the Partnership. And in the end, the court may well conclude that the General Partner acted in good faith and in a manner that is not violative of the Proviso.

But the (i) sheer magnitude of the Subscription Plans in 1998 and 1999, (ii) the book value offering price and (iii) the heavy concentration of ownership placed in Affiliates lead me to conclude that there is a litigable issue of bad faith. While it is not uncommon for employers to issue a substantial number of units to employees as a motivational tool, the Subscription Plans gave employees the chance to turn 60% of their capital accounts into new units at book value. This was a major factor in flipping control of the Partnership from Outside Investors to current employees. Offerings of this magnitude for this purpose are, I think, uncommon. Although the motivation for them may have been pristine, this is not an apt stage of the case to make that determination.

The Subscription Plans simply involve too much of an incentive for insiders to favor themselves to conclude that blatant self-interest did not motivate the General Partner and its control persons to advantage themselves at the expense of the Outside Investors. The fact that Favored Investors were included contributes to this conclusion, as does the later decision of the General Partner to cash out most Outside Investors for book value while reserving to itself the right to change the rules of the game down the line for the benefit of its current control persons.

## B. Does The Amended Complaint State A Claim That The Conversion Amendment And Compelled Redemption Program Resulted From A Breach Of Contract Or Fiduciary Duties?

■ In view of the preceding analysis, I need not dilate on the Conversion Amendment or the Compelled Redemption Program at any length. Both clearly involved a conflict between Affiliates of the General Partner and Outside Investors. The General Partner's decision to recommend an amendment to the Partnership Agreement is not governed by the sole and complete discretion standard, and its determination to implement the Compelled Redemption Program cannot realistically be separated from the Amendment's proposal. Therefore, the General Partner's decision to propose the Conversion Amendment was at minimum subject to § 6.11(a)'s requirements and the Proviso standards of § 6.11(b).

While the plaintiffs have not pled facts that suggest that the General Partner did not consider the factors set forth in § 6.11(a), they have pled facts that support an inference of bad faith. According to the plaintiffs, the Conversion Amendment was simply the vehicle to give the General Partner power to implement the Compelled Redemption Program. Through the Amendment, the General Partner wished to set in motion a process that would deprive most Outside Investors of their units at book value, a price the defendants concede does not reflect fair market value, while retaining wide flexibility to exempt Affiliates and Favored Investors. As so viewed, the Amendment and the Compelled Redemption Program involve a huge transfer of wealth and discretionary power to the General Partner and its Affil-

iates, at the direct expense of the Outside Investors.[21]

Nor does the General Partner's decision to subject the Amendment to the approval of Basic Unitholders provide a ratification safe harbor, at least at this stage.[22] The plaintiffs contend that at-will employees of the General Partner controlled a super-majority of the Basic Units. Indeed, most of the employee units were allegedly held directly by Affiliates of the General Part-ner. As a result, most of the Basic Unit-holders were faced with a very different question than were Outside Investors who were Basic Unitholders. In the case of lower level *at-will* employees, it is difficult to conclude at a pleading stage that the vote was a free one, particularly given that their bosses wanted it to succeed.[23] As to the Affiliates, the Amendment and the Compelled Redemption Program arrogat-ed to them (as the persons who manage partners the right to compete with the Part-nership. By its plain terms, the Compelled Redemption Program contemplates that an employee who has left or who leaves the Partnership to work for a competitor within three years of her departure will have her units immediately redeemed. Like the Pro-gram generally, this feature applies retroac-tively and thus deprives any Outside Investors affected by it to a penalty for their exercise of their rights under § 7.3. Furthermore, the clear intent of this aspect of the Program is to put current employee-unitholders to a Hob-son's Choice between retaining their units and competing with the Partnership. What good is the contractual right to compete with the Partnership if the price of exercise is the immediate loss of one's status as a unithold-er? This aspect of the Program is troubling in another respect. Because the General Partner can exempt itself and its Affiliates from forced redemption, it can allow itself and its Affiliates to compete without being required to give up their units.

Although the plaintiffs' more general effort to resort to the implied covenant of good faith and dealing as a method of avoiding express provisions of the Agreement is without merit and unworthy of discussion, in this respect the plaintiffs have a litigable point because this aspect of the Compelled Redemption Pro-gram has the (arguable) effect of gutting an express contractual right belonging to unit-holders. I am, however, uncertain whether the plaintiffs before the court have standing to press this argument, because it mostly seems to affect current Partnership employees. Be-cause I have found that the complaint other-wise states claims, this and other questions raised by this issue (*e.g.*, ratification by cur-rent employees) can be addressed later in the case.

---

**21.** In their brief, the defendants argue that the General Partner's business purpose for the actions the General Partner has taken is self-evidently proper: place ownership of the Partnership exclusively in the hands of the workers responsible for its success. In deny-ing this motion, I in no way mean to display insensitivity to the idea that it is socially use-ful to provide workers with a real stake in the entities for which they toil. The question, however, is somewhat different than whether worker ownership is a good thing in the ab-stract. The more pertinent question is wheth-er management can, in the name of worker ownership, deprive non-workers of their exist-ing stake in the entity at less than fair market value, through either purposeful dilution of their interests or a compelled sale? One won-ders whether the defendants pondered the (admittedly imperfect) analogy between their firm-level actions and the larger-scale societal initiatives undertaken by, for example, Fidel Castro and Vladimir Lenin, which involved the taking of property in the name (if not by any genuine measure, to implement the reali-ty) of worker ownership.

**22.** The defendants allege that a majority of Outside Investors voted for the Conversion Amendment. If that is true, the *possibility* that the vote had a liability-extinguishing ef-fect exists. In the face of such a proven fact, the plaintiffs would be required to produce evidence that the voters were misinformed or coerced. In this regard, the plaintiffs are urged to reassess some of the less than com-pelling arguments in their brief, *see* Plaintiffs' Br. at 30, and focus on those arguments that address matters that might have been materi-al to the vote's outcome.

**23.** The plaintiffs also argue that the Com-pelled Redemption Program violates § 7.3 of the Agreement. That section gives limited

the Partnership) great authority to cash-out or not cash-out particular people's units. Moreover, these higher level Affiliates were well-situated to insulate themselves from any downside effects on their personal wealth from the conversion of their Basic Units, a posture unlike that occupied by the Outside Investors.

 Therefore, I do not grant defendants' motion to dismiss plaintiffs' challenge to the Conversion Amendment and the Compelled Redemption Program.[24]

### V. Conclusion

The defendants' motion to dismiss is denied, subject to the requirement that the plaintiffs file a second amended complaint incorporating the allegations raised in their brief. The plaintiffs shall submit a conforming order within seven days. IT IS SO ORDERED.

---

**24.** I do agree, however, with the defendants that the plaintiffs' allegation that Outside Investors were coerced in the voting process by the defendants is now supported only by conclusory and, indeed, incoherent accusations that Outside Investors were threatened in some unspecified way. The plaintiffs are, however, free to amend to plead this aspect of their case in an adequate manner.

By contrast, I disagree with the defendants' argument that the individual defendants must be dismissed from the suit. Their argument in this regard raises yet again the awkward position occupied by directors of corporate General Partners. See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., Del.Ch., C.A. No. 15754, 2000 WL 1476663, at *20, Strine, V.C. (Sept. 27, 2000) (discussing some of the anomalies raised by this issue). Do they own fiduciary duties to limited partners akin to those owed by corporate directors to stockholders, even though it is the corporate general partner which is the core fiduciary? Prior cases have held that the answer is yes where directors of a corporate general partner have acted in a way that is potentially advantageous to their personal interests and at the expense of the limited partners. See In re USACafes, L.P. Litig., Del.Ch., 600 A.2d 43 (1991); Wallace v. Wood, Del.Ch., 752 A.2d 1175, 1180 (1999); In re Boston Celtics Limited Partnership Shareholders Litig., C.A. No. 16511, 1999 WL 641902, at *4, Steele, V.C. (Aug. 6, 1999). In this case, the named defendants are directors and/or officers of the General Partner, each of whom is alleged to have a substantial ownership in the Partnership. It is inferable from the complaint that by way of the actions challenged in the complaint each of the individual defendants increased his proportionate ownership in the Partnership at the expense of Outside Investors. While it is generally true that nonparties to a contract may not bear contractual liabilities, our limited partnership case law recognizes that a director of a corporate general partner may still bear fiduciary liability if the director's conduct causes the corporate general partner to breach a modified fiduciary or substitute contractual duty to the limited partners. See Gotham Partners v. Hallwood Realty Partners, L.P., Del.Ch., C.A. No. 15754, mem. op. at 75–77, 2001 WL 1823944, Strine, V.C. (July 18, 2001, corr. Aug. 1, 2001). In this respect, the director's ability to disclaim liability for breach of fiduciary duty depends on whether the corporate general partner he helps control has properly invoked a contractual safe harbor. In this case, there are surviving allegations that the General Partner breached the modified loyalty duties it owed to the Outside Investors, to the personal benefit of the individual defendants. Because these allegations implicate the (albeit modified) duty of loyalty derivatively owed by the individual defendants, their argument that they are exonerated is denied, at least at this early stage of the litigation.