Robert W. GELFMAN, Mark Allen, Ameribank Trust, Shirley Collins, David Derhodes, Fumi Fukada, Mary Rounseville, P.J. Hayes, Shirley Sarpa–Blackburn, Lisa Sarpa Snyder, Thomas E. Tice, Thomas C. Hellman, and Ralph S. Giorgio, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

WEEDEN INVESTORS, L.P., Weeden Securities Corporation, Donald Weeden, Barry Small, Robert Cervoni, Timothy McDonald, Robert Weppler and Stephen Leuthold, Defendants.

Civ. A. No. 18519.

Court of Chancery of Delaware, New Castle County.

Submitted: May 3, 2004.
Decided: June 14, 2004.
Revised: July 12, 2004.

Pamela S. Tikellis and Robert J. Kriner, Jr., of Chimicles & Tikellis, Wilmington; Lynda J. Grant, of Goodkind Labaton Rudoff & Sucharow, New York City, Robert W. Biederman, of Hubbard & Biederman, D. Ronald Reneker, of Craddock, Reneker & Davis, Dallas, TX, of counsel, for Plaintiffs.

Bruce E. Jameson, of Prickett, Jones & Elliot, Wilmington; David E. Nachman, James D. Mathias, and Glenn C. Edwards, of Piper Rudnick, New York City, of counsel, for Defendants.

## OPINION

STRINE, Vice Chancellor.

In this case, a group of limited partners in Weeden Investors, L.P. allege that Weeden's corporate general partner and its board of directors violated their contractual and fiduciary duties. At trial, the plaintiffs pressed two major claims.

The first is an allegation that the defendants issued an excessive number of new units in Weeden during the late 1990s. According to the plaintiffs, the purpose of these new issuances was to enrich the managers and directors of the general partner at the expense of those Weeden limited partners who were not employees or directors, i.e., the "Outside Investors." By this time, the plaintiffs allege, the general partner and its board had decided that the profits of Weeden ought to be reaped almost exclusively by employees and directors and that there was no place in Weeden for limited partners who either never had or no longer had a position of employment or directorship at Weeden. To this end, during the late 1990s, the defendants supposedly caused Weeden to issue a huge number of units to employees, directors, and certain friends of management. This diluted the outside investors in Weeden, to their economic detriment.

In response, the defendants argue that Weeden—a broker-dealer that exclusively focuses on the execution of securities trades—faced competitive hiring pressures during the go-go period of the late 1990s. In order to remain competitive, the firm had to provide incentives to its employees, and the most rational way to do this was through new unit issuances. All of the issuances that occurred, say the defendants, were rationally designed to benefit Weeden as a partnership. Moreover, the defendants claim, the partnership agreement gave the general partner broad discretion to issue new units and insulates the general partner and its board from liability unless they acted with gross negligence or with an illicit state of mind.

In this post-trial opinion, I conclude that the plaintiffs have prevailed on only one aspect of their dilution claim. Even given the wide discretion the partnership agreement gives to the defendants to issue new units without fear of liability, the defendants managed to step out of bounds in one important respect. By deciding to permit the general partner's outside directors to acquire new units at a favorable price and by denying the same opportunity to Outside Investors, the defendants

breached their contractual duties. This decision, I find, was not undertaken in good faith but instead as quid pro quo for the outside directors' willing assent to the issuance of a large number of new units to management and employees. The purported rationales for permitting outside directors to purchase new units at a time when Outside Investors were suffering serious dilution and cuts in their profit distributions emerge as pretextual, and contribute to the inference that the general partner and its board knew that the outside directors were enriching themselves at the expense of Outside Investors, without any tangible benefit to the performance of the partnership. Furthermore, the opportunity to purchase new units was far too substantial to be considered fair compensation for the modest work effort expected of and contribution made by the general partner's board. Therefore, a monetary damages award will be made to the class of outside investors adversely affected by this dilution, the so-called "Dilution Class."

The plaintiffs' second claim involves the decision by the general partner to amend the partnership agreement and to take away key protections belonging to owners of Weeden's "Basic Units." Because the general partner and its affiliates controlled the vote on the amendments, the vote's outcome was preordained. Moreover, in connection with the vote, the general partner misinformed the Outside Investors by indicating that the amendments and, as important, the redemption plan they were designed to implement, had been crafted by a unit committee of outside, non-employee directors, when in fact the amendments and the plan had been crafted primarily by management and the unit committee had been chaired by Donald Weeden, Weeden's Chairman, controlling stockholder, and most powerful executive, and had taken its cue from management, who attended and led each of the brief meetings held by the unit committee.

The redemption plan that the amendments implemented involved the involuntary squeeze-out of unitholders on a schedule that took into account partners' employment and director status. The defendants' rationale for the plan was that it was necessary for Weeden to put in place a system for recycling units from one generation of employees to the next and to come to grips with its need to be an employee-owned firm. Because Weeden had never used written employment contracts and had not obtained the contractual right to redeem Basic Units from holders, except if the general partner owned 90% of the units and even then only if it paid fair market value, the general partner wanted to set up a more structured system going forward and designed the amendments with that in mind.

The problem with the system that the defendants designed, from the plaintiffs' perspective, is that it exacted a steep penalty from the Outside Investors. For Outside Investors who owned fewer than 1000 Basic Units, the plan called for them to be deprived of their units for book value immediately. For Outside Investors who used to be employees, the plan redeemed their units on a schedule tied to years of service but applied retroactively to their date of departure, leading to very short redemption schedules, again at book value. For Outside Investors who never served as employees, they were to lose their units on a 10-year schedule in exchange for book value. For former employees who had exercised their freedom to work for a competitor—a freedom they had under the partnership agreement and because Weeden had no contractual protections against competition—the schedule took their units immediately at book value.

The general partner, its current employees (including management), and its directors did not, however, face the same situation. Instead, most of the top managers would likely have more than 15 years of service by the time they left Weeden and therefore were subject to a lengthy 13–year schedule that would not apply until they left Weeden. That schedule gave them three years of continued distributions until a ten-year redemption schedule kicked in involving the redemption of 10% of their units a year. Likewise, most of the directors also received this "13–year Payout." Notably, in implementing the redemption plan, the general partner retained absolute discretion to modify it, and used that discretion even before the plan's implementation to benefit outside directors who wanted to benefit from a 13–year Payout despite not being formally eligible.

In this connection, it is also notable that management and the outside directors all held a form of partnership unit, "Callable Units," that were redeemable at the general partner's discretion at any time for book value. Under the plan as adopted, the Callable Units held by a manager or director with 15 years at Weeden would only be redeemed after they left service and then using the 13–year Payout. Therefore, the Outside Investors found themselves subject to a more severe payout schedule for Basic Units, which the general partner never had the power to redeem before the amendments, while management and the board extended the life of, and therefore increased the economic value of, their own Callable Units.

Critical to this claim is the undisputed fact that a unit of Weeden is worth far more than book value. No defendant would willingly accept anything near book value for a unit of Weeden. Yet the defendants consciously decided to deprive Outside Investors of their units for less than fair market value in order to shift the ownership of Weeden exclusively to employees, directors, and the close family members of employees and directors.

In this opinion, I conclude that the defendants' treatment of the Outside Investors constituted a breach of their fiduciary and contractual duties. By knowingly taking property from Outside Investors for less than fair market value and simultaneously securing favorable treatment for their own holdings, the defendants consciously pursued a course of action that was improper. The intentional decision to deprive Outside Investors of these units at an unfair price at a time when Weeden was thriving, when no exigency required such harsh treatment, and when the board was simultaneously increasing the value of its own Callable Units cannot be rationalized as good faith action. Moreover, the cursory and uninformed process by which they reached their decisions did not comply with the requirements of the partnership agreement governing the resolution of conflicts of interest by the general partner, and therefore the default fiduciary standard of entire fairness applied to their conduct, a standard that the defendants do not come close to satisfying.

As a remedy for these violations, I award a monetary remedy for the relevant class, the so-called "Redemption Class," tied to an estimation of the fair market value of Weeden.[1] The parties are instructed to work together to craft a final judgment that specifies exactly the remedy for various members of the two affected classes.

## I.  *Factual Background*

### *The Early Years Of Weeden*

Weeden's history as a firm helps explain why this dispute eventuated. In a sense,

---

1.  By prior order, each class was earlier certified by the court.

Weeden involved the recreation of an earlier firm that had been started by defendant Donald Weeden's father. The "Old Weeden" had run into financial difficulties and its remnants had been absorbed into another broker-dealer Moseley, Hallgarten, Estabrook & Weeden. The Old Weeden group worked as a unit at Moseley, Hallgarten and decided to break free and start the "New Weeden" in 1986, which I will simply call "Weeden."

Donald Weeden raised $10 million in capital for Weeden, which was at that time a corporation. Most of the investors paid a price of $10 per share.

Within a year of its creation, Weeden converted itself from a corporation into a limited partnership, to receive better tax treatment of profit distributions. In simple terms, all of the assets of the corporation were transferred to Weeden Investors, L.P. and the stockholders of the corporation became limited partners and received partnership units in exchange for their shares.[2]

A corporation solely owned by Donald Weeden—Weeden Securities Corporation—became the "General Partner" of Weeden and has a one percent interest in the profits and losses of Weeden. Donald Weeden therefore has had the sole say in who served as a director of the General Partner and a correspondingly influential say in who served as officers of the General Partner and, in turn, Weeden itself.

At the time of conversion, the only form of partnership units that existed at Weeden were so-called "Basic Units." These Basic Units were not subject to involuntary redemption by the General Partner, except in circumstances when the General Partner acquired 90% or more of the units. In that circumstance, the General Partner could involuntarily redeem the Basic Units at fair market value.[3] At that time, non-employee investors owned approximately 70% of the Basic Units; employees owned the remaining 29%.

From the get-go, Weeden operated with an informality that later helped fuel this dispute. Unlike many broker-dealers, Weeden did not set up a system of contracting to address the fact that talented employees are expensive to retain and have attractive opportunities elsewhere. This reality is often addressed in part through compensation systems that provide employees with the opportunity to buy units of the firm at book value, subject to redemption at book value in the event that the employees leave for greener pastures or otherwise. These systems are often accompanied by written non-competition agreements that prohibit employees from competing with the firm after departure, except under certain conditions.

By contrast, Weeden did not have written employment contracts with its employees or written non-competition agreements. Nor did the Partnership Agreement provide for the involuntary redemption of Basic Units, held by employees or otherwise, except under the restrictive terms discussed above. In fact, the Partnership Agreement actually contained an affirmative protection for Basic Unitholders who wished to compete with Weeden. That protection states:

---

2. An operating partnership was actually formed, of which Weeden is the sole limited partner and of which Weeden Securities is the General Partner. That complexity is not relevant to this case which turns on the rights of the plaintiff classes under the limited partnership agreement of Weeden, the sole limited partner of the operating level partnership.

3. *See* Partnership Agreement at A–11 (definition of "Purchase Price"); *id.* § 17.1 (providing General Partner the right to acquire units under certain circumstances).

7.3. *Outside Activities.* Except as provided in Section 6.6 with respect to the General Partner, a Limited Partner shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including business interests and activities in direct competition with the Partnership or the Operating Partnership. Neither the Partnership nor any of the other Partners shall have any rights by virtue of this Agreement in any business ventures of any Limited Partner.[4]

Weeden embarked on its business plan with these basic procedures in place. In general, it did quite well for a new concern. Although it was unsuccessful in an effort to expand into the investment banking business, its core business as a "pure execution house" for the completion of trades in securities thrived and enabled the firm to pay out sizable distributions to its unitholders on an annual basis.

As part of its business strategy, Weeden rewarded its key trading employees primarily in two ways: 1) with non-guaranteed cash compensation that rewarded them for sales success; and 2) with grants of partnership Basic Units. In particular, the grant of units was consistent with Weeden's goal of increasing employee ownership as a business strategy to increase the firm's profitability.

The focus on employee ownership resulted in large measure because of Weeden's particular business focus. Although it attempted to develop an investment banking business in the late 1980s, by the end of the decade that initiative had faltered. As a result, Weeden's business from then on exclusively involved the execution of trades. This made Weeden very dependent for its success on the effectiveness of its so-called "salestraders," traders who could not only trade but who could also land big customers. Competing in the execution business was difficult for Weeden because it did not offer other services to institutions who needed trading services— such as a sales outlet for the sale of shares in their mutual funds—that other broker-dealers who provided trading services could offer. When a successful salestrader departed, Weeden faced the risk that the salestrader's clients would leave with her or simply choose another firm to execute its trades. Because the firm was so dependent on human capital for its success and was not diversified in its strategy, the General Partner believed that it was necessary to create incentives for employees that aligned their interests with those of Weeden. Furthermore, because Weeden had left the capital-intensive investment banking field, the General Partner came to believe that the firm had little need for cash capital, as its success depended primarily on its human capital.

With these beliefs and objectives in mind, Weeden took steps to concentrate ownership in its employees during the late 1980s and early 1990s. One of the methods it used was to encourage non-employee owners to tender Basic Units back to the firm at book value. These Basic Units could then be recycled and placed in the hands of employees. Relatedly, Weeden also made distributions of capital during this period to all unitholders, but generally permitted only employees to reinvest the distributions in the firm in exchange for new Units. Many of the non-employee investors who tendered Basic Units back— including General Partner director and defendant Benjamin Jaffray—believed that they were doing Weeden a favor by agreeing to sell back for book value. Indeed, Jaffray refused to sell back more units at

---

**4.** Partnership Agreement § 7.3.

book value in 1992 when asked a second time because he believed he had sacrificed enough. Although this voluntary recycling program was imperfect, it did enable Weeden to change the percentage of employee ownership from 30% to 70%.

Nonetheless, because most of the holders of Basic Units believed them to be worth more than book value, the General Partner remained concerned. As employees left, they had an economic incentive to retain their Basic Units even though the General Partner had provided employees with Basic Units as an employment incentive, rather than in order to raise capital from them.

To address this concern, the General Partner created a new class of partnership units in late 1992 that were redeemable at the discretion of the General Partner for book value. The existing unitholders were told that the General Partner could call back the "Callable Units" at book value when employees left, providing an incentive for employees to remain at the firm and freeing up units from departing employees to grant to their replacements. After the creation of the Callable Units, Weeden issued no further Basic Units.

The General Partner also continued to use its other related technique to increase employee ownership during this period. For example, in 1993, the General Partner caused Weeden to make a capital distribution to all unitholders. But only certain unitholders—i.e., those who were employees and a select few others—were permitted to reinvest their capital distribution by subscribing for additional Callable Units at book value. The original Outside Investors who were not employees were not given the opportunity to participate.

In their post-trial brief, the plaintiffs treat the period 1987 to 1996 as a sort of era, even though there is no evidence that the General Partner or anyone conceived of it that way at the time. Nonetheless, because the plaintiffs have, for litigation purposes, bracketed it in that way, it is useful to summarize that period in terms of its effect on Weeden's ownership structure.

From 1987 to 1996, the number of outstanding units nearly doubled, going from slightly over a million units to slightly over 1.9 million units. The balance of ownership had shifted from non-employees to employees. But the effects of this dilution and shift did not translate into negative economic effects on the per-unit distributions to non-employee unitholders. Because of Weeden's strong performance, earnings kept up with dilution and Outside Investors received healthy distributions throughout this period. As to these basic facts, both the plaintiffs and the defendants now agree.[5]

### The Period From 1997 Forward

The decisions of the General Partner that are under attack in this litigation commenced in 1997. To understand the plaintiffs' challenges and the defendants' response, it is useful at this stage to describe the management and board structure at Weeden.

### The Key Managers

The most important managers at Weeden are defendants. Defendant Donald Weeden is the person most associated with the firm that bears his family name. He remains the most powerful force at Weeden and this was true throughout the periods relevant to this case. Donald Weeden is the sole owner of the General Partner.

---

5. The plaintiffs' agreement has something to do with the fact that their attack on certain

unit issuances pre-dating November 1997 was dismissed as untimely. *See infra* note 6.

Although his managerial title is Executive Vice President and there are other managers who are crucial to Weeden's success, Don Weeden is the Chairman of the board of directors of the General Partner. Unless Don Weeden supports an initiative, there is every reason to believe that that initiative will not proceed.

The managers most involved in shaping the day-to-day implementation of Weeden's business strategy are defendants Barry Small and Robert Cervoni. Small is Weeden's President and Chief Executive Officer, and has been a director of the General Partner since 1986. Along with his duties as CEO in providing overall direction to the firm, Small still trades securities and is one of the salestraders upon whom Weeden depends for its success. For his part, Cervoni is a jack-of-all trades who essentially functions as Weeden's chief of administration. Aside from serving as Chief Financial Officer, Cervoni also oversees all the firm's administrative functions, such as technology, compliance, and facilities management. In 1991, Cervoni joined the General Partner's board of directors. Both Small and Cervoni have been with Weeden since its inception in the 1980s. Along with some of the key salestraders (e.g., defendant Timothy McDonald, who was also a director of the General Partner at all relevant times), Small and Cervoni are the most influential personnel at Weeden.

During this period, the defendant-directors of the General Partner other than Weeden, Small, Cervoni, and McDonald were as follows:

- Robert DeMichele—DeMichele joined the board in 1996. Several years earlier, a group of investors with which he was affiliated purchased a warrant to buy a large block of Weeden units. The warrant, which required the payment of a premium to book value of 36%, was executed in 1991. DeMichele is not employed by Weeden.

- Defendant Richard Sharp—Sharp joined the board in 1996. Sharp's law firm, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, served as outside counsel for Weeden and reaped substantial fees for his firm in that capacity.

- Steve Leuthold—Leuthold joined the board in 1987 and left in May 2000. Leuthold is an employee of Weeden.

- Robert Weppler—Weppler joined the board in 1986 and resigned in December 2000. Weppler was an executive for Weeden during most of his board service. He left Weeden as an employee in the late 1990s.

- Benjamin Jaffray—Jaffray was a director of Weeden from its inception until his resignation in December 2000. Before his retirement, Jaffray held high-level positions at Cargill. While at Cargill, Jaffray became acquainted with Don Weeden and was an original investor in Weeden.

- Frederick T. Weyerhauser—Weyerhauser joined the board in 1987 after a period of time during which his son had served on the board. Weyerhauser resigned from the board in December 2000. Weyerhauser, through various family trusts and interests, was one of the more significant investors in the original round of financing for Weeden and served on the board largely to monitor his investment.

- Daniel Panker—Panker joined the board of the General Partner in September 2000.

During the relevant period, each nonemployee member of the board received $1000 per meeting. The only other perquisites appear to have been that certain board meetings were planned in nice getaway locations. Weeden also did not have a

directors and officers' insurance policy in place to protect the board. Nonetheless, despite the minimal pay and lack of insurance, Weeden had no problem with director retention. This no doubt reflected the fact that several of the outside directors had other reasons to continue to serve, such as their service as counsel in Sharp's case or their interest as an investor in the case of the others, and such as deriving personal fulfillment from performing the duties of a director. It also reflects the fact that the board's duties were not onerous and did not involve large commitments of time.

### The Issuance Of New Units In The Period 1997 To 2000

The plaintiffs' real beef with the defendants starts in 1997, although they only seek relief as to issuances occurring in 1998 and later years.[6] In that year, Weeden increased the number of outstanding units by over 31%. That increase was accomplished in part by virtue of a $2.00 per unit distribution of capital. In keeping with past practice, employees were permitted to re-invest their capital in new Callable Units at book value. But, in a new twist, the non-employee directors were included in this opportunity, although no disclosure of that fact was made to the unitholders. All of the non-employee directors took advantage of that opportunity. In communications to the unitholders regarding the return of capital, the General Partner had highlighted that employees would be encouraged to invest as part of Weeden's business strategy of encouraging employee ownership. The unitholders were not told that the outside directors were now given this reinvestment opportunity as well.

The acceleration of unit issuances in 1997 was attributed by the defendants to the competitive pressures of a bull market. In particular, top salestraders were in high demand. Many other firms were offering guaranteed compensation packages to salestraders that were lucrative. Management felt that Weeden needed to remain competitive in compensation by increasing unit issuances to its employees as a retention device, especially because Weeden's cash compensation program was largely performance-based and not guaranteed. In addition, Weeden, for various legal reasons, had issued very few units during the prior several years. Although the plaintiffs question the sincerity of these rationales, I am persuaded that in general these explanations are rational ones and not pretextual. This is not to say that the magnitude of the General Partner's unit issuances, the full extent of which will soon be discussed, does not give some pause and that the normally voracious appetites of securities traders for riches did not factor into the key managers' thinking about their own share of the new units, only that in the go-go period of the late 1990s on Wall Street, I am convinced that the General Partner did face real competitive hiring pressures and that this was a substantial factor in its decision-making.[7]

---

6. The plaintiffs stipulated that, consistent with this court's prior ruling, they do not seek damages in connection with the 1997 issuance of units to the outside directors, because any damages claim would be time-barred. *See Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977, 984 n. 10 (Del.Ch.2001) (*"Gelfman I"*) (noting that plaintiffs had conceded that any challenge to actions that occurred before November 21, 1997 are time-barred). I therefore discuss these issuances only for purposes of describing the factual background. The decisions made in 1997 are critical to the validity of the later issuances to outside directors in 1998.

7. Factors that cut against the defendants' rationale include: 1) the level of cash compensation paid to Weeden employees, which while not guaranteed, compared favorably to

In large measure, Cervoni, Small and some other top managers conceived the unit issuance plan. In allocating units, they took into account the productivity of different employees. Furthermore, for certain employees who performed at a high level, the plan sought to maintain their pro rata interest in the firm—e.g., if an employee had been determined to be valuable enough to receive an ownership interest of a half a percent, Cervoni and company sought to issue sufficient units to keep the employee at that level if her performance continued to justify that.[8] On the other hand, the means that were chosen to accomplish the stated goals were somewhat imprecise in that each and every employee was given the right to reinvest to the extent of their cash distributions, which meant that the reinvestment portion of the program did not correspond to any current assessment of an individual's performance but simply afforded every employee the right to reinvest whatever capital they received back based on their existing unit ownership.

Much more questionable, however, than the treatment of employees or the way it was done in 1997 was the inclusion of outside directors in the reinvestment opportunity. The origin of this inclusion smacks of political logrolling. The decision to include the outside directors was formally made at a December 1996 board meeting, at which it was decided to allow "insiders" to reinvest.[9] Insiders were defined as employees, directors, and their blood relatives.

The inspiration for the outside directors' inclusion came from the outside directors themselves. The outside directors approached management and asked to be included in view of the substantial acceleration in dilution that was planned. This dilution stemmed from the pressures mentioned above and from a virtual hiatus in unit issuances in the prior three years. The outside directors argued that they should be included and therefore protect themselves from dilution because of the services they rendered as directors and because a few of their number had voluntarily put back units at book value in 1991 and 1992 when asked by the General Partner. Management acceded to this request and implemented the distribution and rein-

---

competitor firms; 2) the relative stability Weeden had experienced in its employee ranks; and 3) the absence of any record evidence that any of the key producers were seriously considering departure. Despite this, I believe there was a rational basis for Weeden to respond to rising levels of pay on Wall Street with improved incentives in order to ensure the stability of its workforce and encourage production from them.

8.  One of the methods by which this was accomplished was through the distribution of so-called "Incentive Units." Incentive Units entitled the holder to a profit participation equal to an actual Callable Unit. But Incentive Units were not in fact partnership units. They would only become so when the holder exercised the right to convert the Incentive Unit into a Callable Unit at book value. By their plain terms, Incentive Units were supposed to expire in ten years unless converted.

In reality, when Incentive Units expired they were typically replaced by new Incentive Units with another ten-year term. This was true for Cervoni and Small. The outside directors' knowledge of this practice appears to have been minimal (from the trial testimony) and it appears that this practice was managerially driven without any real oversight by the outside directors. As a result, this practice adds flavor to the plaintiffs' case but it is not the basis for a specific claim. For that reason and because the actual ownership interests of Don Weeden, Small, and Cervoni did not grow materially in the period 1997 to 2000, I do not concentrate further on this aspect of Weeden's capital structure. Incentive Units are, however, factored into the profit shares of various defendants, when those are cited in the opinion.

9.  JX 160.

vestment opportunity in a way that did not distinguish among outside directors based on the number of units they owned—even though there were large disparities in the number of units outside directors owned—or whether the outside directors had all voluntarily put back units in the past—several of them had not. That is, each director was given the right to reinvest his return of capital, no more and no less. This left those outside directors with the largest holdings receiving much greater benefits than their colleagues with a smaller number of units. The basic idea (implicit though it was) was that it was a benefit of being a director to be able to protect one's self against dilution by being permitted to reinvest pro rata to one's pre-existing ownership stake. In connection with this decision, the board of the General Partner engaged in minimal deliberations and did not evaluate whether the inclusion of the outside directors in this program was fair to Weeden's other non-employee unitholders, many of whom had also tendered back units at book value in 1991 and 1992.

In 1997, the General Partner approved an even larger increase in outstanding units, an increase to occur on January 1, 1998. That increase more than doubled the number of outstanding units from over 2.5 million to over 5.6 million. The overwhelming portion of these new units went—as had the new units in 1997—to employees of Weeden.

Again, the plan for allocating the new units was primarily the product of a management process led by Cervoni, Small and others. As before, the plan also involved a substantial return of capital—this time of $5 per unit—that employees were permitted to use to buy new Callable Units at book value. The Outside Investors were once again informed that employees would have this opportunity: "As in the past, employees will be encouraged to re-invest their distribution as a way of increasing their incentives and their percentage ownership. The Weeden employees and management are motivated and will work hard to deliver a profitable 1998."[10] But what the unitholders were again not told was that the outside directors had also afforded themselves the same opportunity as employees.

The outside directors took full advantage of this opportunity and purchased 344,839 Callable Units in return for the capital that would have otherwise been returned to them. That capital equaled $1.53 million in value. Putting this money at risk turned out to be wise, as the outside directors received a total of over $3.7 million in distributions during 1998 to 2000 from these units—a handsome return on investment by any measure. As was the case a year earlier, the board of the General Partner did not consider the fairness of including the outside directors to the other non-employee unitholders and engaged in deliberations that can only be described as perfunctory at best.

In 1998, the General Partner also permitted another group of unitholders to re-invest their capital distribution. Frankly, the best way to characterize this group is as "Favorites of Management." These Favorites of Management were former employees who Don Weeden, Cervoni or Small felt were deserving of this opportunity for one reason or another. The relevant documents shed little light on the reasons the Favorites were selected, except that a few were "special"[11] or their "relationship" with Weeden implicitly justi-

10. JX 189.

11. JX 223.

fied it.[12]

At trial, the defendants basically admitted that these decisions were made on an ad hoc basis. Former employees who were considered particularly loyal or who were fondly regarded were given this valuable chance. In one case, that of Steve Gladstone, the defendants suggested that he was a major producer for years and that giving him one last opportunity was a fitting thing as current employees would learn of that generous treatment and feel good about Weeden and want to stay. As the plaintiffs point out, this rationale is a bit jarring coming from the defendants, who sought to shield disclosure of unit ownership from discovery on the grounds that Weeden strictly limits access to that information internally so that employees don't know who gets and owns what. In any event, the bottom line is that a group of Favorites of Management ended up receiving over a quarter of a million units in 1997 and 1998 collectively.

In 1999 and 2000, the total number of outstanding units grew from over 5.6 million to over 7.6 million. Once again, most of these units went to employees. But the outside directors were each given the right to purchase relatively small amounts of additional units.[13] The Favorites of Management did not receive additional units, however. During these years, the unit issuance plan was again produced largely under the direction of Cervoni and Small.

### The Effect Of The Unit Issuances From 1997 To 2000

The period of 1997 to 2000 was a profitable one at Weeden. But the benefits of that increased prosperity flowed to a large extent to those unitholders who were issued new units or permitted to reinvest their returned capital—i.e., employees, outside directors, and Favorites of Management—and not to the Outside Investors. By way of example, Cervoni's annual distributions from his units rose nearly 200%,[14] Donald Weeden's by 126%, and outside director Benjamin Jaffray's by 103%. By contrast, the class representatives for the Outside Investors saw their annual distributions decline by 36%.

Of course, in considering this change, several factors must be taken into account. One is that those eligible to reinvest had to pay book value for their units by leaving their return of capital with Weeden. For the outside directors, for example, this meant that they paid slightly over $1.5 million in 1998 to get a substantial number of units. Over the succeeding three years, however, those new units yielded them distributions of over $3.7 million, an impressive investment return by any measure. Correspondingly impressive investment returns were received by the Favorites of Management and by the employees.

The distinguishing difference among those classes is rather stark and obvious, however. According to the defendants, the key to Weeden's success are its employees and particularly its salestraders. By contrast, its board of directors by its own admission did not put in many hours a year and did not generate business for the firm. Former-employee Favorites of Man-

---

12. *Id.*

13. JX 216 (under 1999 unit issuance plan, each outside director could purchase $10,000 worth of units at book value, with the exception of director Sharp, who was allowed to purchase $30,000); JX 239 (2000 plan allowing outside directors to purchase $30,000 worth of units at book value plus providing some additional units to family members of outside directors).

14. I include units Cervoni directed to his family.

agement also did not generate business for the firm. Given the defendants' insistence—which will be stressed even more in a moment—that Weeden did not need cash capital by that time, and the decision to allow outside directors and Favorites of Management to increase their units so substantially, at a time when the Outside Investors were experiencing diminished returns, it is not surprising that the plaintiffs have challenged these issuances as violative of the General Partner's contractual and fiduciary duties.

With that groundwork completed, I next turn to the other key action of the General Partner and its directors that the plaintiffs attack.

### The Reclassification And Redemption Schedule

In October 1999, the General Partner's board approved the formation of a "Unit Committee." The purpose of the Unit Committee was to consider a plan that management would propose to revamp the unit structure of Weeden. Inspiring this move was a sense that Weeden's then-existing structure was not sensibly designed in light of the firm's status as a relatively small broker-dealer that was a pure "execution house" and therefore uniquely dependent on its employees for its success. Although Weeden had used several techniques to increase employee ownership over the years, management believed there should be a more clearly defined incentive system for employees, a clear set of expectations on the part of unitholders as to how long they would hold units, and a system for regularly recycling units for issuance to newer employees. Originally, the Unit Committee was going to consider changes involving only the

Callable Units but then decided to address all Units, including Basic Units.

From the get-go, there emerges a lack of clarity about a mundane aspect of the Unit Committee: its exact membership. When the board created the Unit Committee, the minutes identified the members as including outside directors Weyerhauser, DeMichele, and Jaffray. But the reality was that the Chairman of the Unit Committee was Donald Weeden. Despite what can only be called silly protestations by the defendants to the contrary, the record evidence (including Committee minutes) overwhelmingly demonstrates that Donald Weeden was the Chairman and even he eventually conceded that fact when he testified. Donald Sharp, whose law firm was outside counsel to Weeden and the General Partner, also participated in the Unit Committee's deliberations, as did Cervoni, who prepared the minutes of their meetings.

The plan that the Committee ultimately addressed—the "Redemption Schedule"—was drafted by Cervoni and other managers. In performing that drafting, Cervoni and his team did not seek or in any way use the advice of outside personnel experts or outside valuation experts. The record created by the Unit Committee of its brief deliberations was skimpy.[15] There was no formal report reflecting the reasoning that supported Cervoni's plan. To the extent that legal advice was sought, it came through Sharp, an outside director who owned no Basic Units, and who sought advice from Delaware counsel only regarding certain narrow issues, which did not extend to the equitable duties of the General Partner and its directors (including any similar duties required by the Partnership Agreement). To understand the significance of these issues, one has to

---

**15.** The Unit Committee appears to have had three short meetings. The memories of the participants about the meetings were less than helpful and support the inference that management presentations dominated what time was spent.

consider the Redemption Schedule that ultimately resulted because that Schedule had a starkly different impact on Outside Investors than it did on unitholders who were employees or directors.

The crucial first step to implementing the Redemption Schedule was the conversion of the Basic Units into Callable Units. This conversion, if effected would enable the General Partner to redeem the formerly Basic Units at book value and to escape the provisions of the Partnership Agreement that limited redemption to a situation when the General Partner owned 90% of the units and that required the payment of fair market value in that situation. The conversion, of course, had to be accomplished by an amendment to the Partnership Agreement.

Assuming conversion, Cervoni proposed a Redemption Schedule that, once final-

ized, looked as follows:

WEEDEN INVESTORS, L.P.

PROPOSED CLASS A CALLABLE UNIT REDEMPTION PROGRAM

| | UNIT HOLDER | YEARS OF SERVICE | REDEMPTION SCHEDULE |
|---|---|---|---|
| 1. | Employee of Weeden & Co., LP, Who retires, is terminated without cause or voluntarily leaves and does not go to work for a competitor within 3 years of termination | Less than 5 years | All Units redeemed at December 31 of year in which severance occurs |
| | | 5 years or more but less than 10 years | 20% redeemed in equal installments at end of each of 5 successive years beginning December 31 of year in which severance occurs |
| | | 10 years or more but less than 15 years | 10% redeemed in equal installments at the end of each of 10 successive years beginning December 31 of year in which severance occurs |
| | | 15 years or more | 10% redeemed in equal installments at December 31 of each of 10 successive years beginning December 31 at the end of the third full year after severance |
| 2. | Is terminated for cause; or who voluntarily leaves and goes to work for a competitor within 3 years of termination | N/A | Immediately at termination or at December 31 of year in which termination occurs, determined on case-by-case basis by Board in its sole discretion |
| 3. | Non-employee Director of WSC who retires, is terminated without cause or voluntarily resigns | Less than 5 years | All Units redeemed at December 31 of year in which severance occurs |
| | | 5 years or more but less than 10 years | 20% redeemed in equal installments at end of each of 5 successive years beginning December 31 of year in which severance occurs |
| | | 10 years or more but less than 15 years | 10% redeemed in equal installments at the end of each of 10 successive years beginning December 31 of year in which severance occurs |
| | | 15 years or more | 10% redeemed in equal installments at December 31 of each of 10 successive years beginning December 31 at the end of the third full year after severance |
| 4. | Non-Employee Director of WSC who is terminated for cause | | Immediately at termination or at December 31 of year in which termination occurs, determined on case-by-case basis by Board in its sole discretion |
| 5. | Investors in Basic Units | N/A | 10% redeemed in equal installments at December 31 of each of 10 successive years beginning 12/31/00 |
| 6. | Any Unit Holder with less than 1,000 Units | N/A | 100% redeemed at December 31 of year in which holding is less than 1,000, beginning 12/31/00 |

PROGRAM TO BE IMPLEMENTED RETROACTIVELY

PREVIOUSLY APPROVED TRANSFERS TO FAMILY MEMBERS AND TRUSTS WILL

RECEIVE THE SAME TREATMENT[16]

There are several notable features of this Schedule. Let's start with the effect on Outside Investors who never served as employees or directors of Weeden. If an Outside Investor of that type owned fewer than 1000 shares, she was to be cashed out of her units at book value immediately on December 31, 2000.

If an Outside Investor of that type owned more than 1000 shares, she would have 10% of them cashed out on December 31st of each year, starting on December 31, 2000, at book value. While this is putatively a ten-year pay out schedule, the actual length depends on how many units the Outside Investor owns. Whenever the Outside Investor's remaining units fell at any time below 1,000, the remainder of those units would be taken at that time for book value.

The situation for Outside Investors who were former employees is more complicat-

16. JX 292 Ex. C.

ed. The Redemption Schedule as to them was primarily determined by two factors: their length of service with Weeden and their date of departure from Weeden. By its express terms, the Redemption Schedule operated retroactively. As the example in the Redemption Schedule itself notes, this means that for a former employee with 12 years of service who resigned or retired in 1994, 70% of his units would be redeemed on December 31, 2000. The remaining 30% would be taken out on December 31 of 2001, 2002, and 2003, assuming that the former employee's units did not fall below 1000 before that time.

The retroactivity feature had another important implication. If a former employee was terminated for cause or had gone to work for a Weeden competitor within three years of his severance from Weeden—as former employee and then-Outside Investor Ralph Giorgio did—all of that employee's units would be redeemed immediately on December 31, 2000 at book value. This was a retroactive penalty on behavior that was not prohibited by either the Partnership Agreement or by any employment contracts in place at Weeden. Indeed, Section 7.3 of the Partnership Agreement read as follows:

> 7.3 *Outside Activities.* Except as provided in Section 6.6 with respect to the General Partner, a Limited Partner shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including business interests and activities in direct competition with the Partnership or the Operating Partnership. Neither the Partnership nor any of the other Partners shall have any rights by virtue of this Agreement in any business venture of any Limited Partner.

Finally, the implications of the Redemption Schedule for then-current employees and directors with 15 years of service are worth noting. First, the retained discretion of the General Partner gave all of the defendants—as directors—some hope that they could get better treatment if they continued in the good graces of the General Partner. Putting that aside, however, the Redemption Schedule gave them upon departure from office the 13–year Payout involving: 1) a three-year grace period as to all units, i.e., three years of continued distributions; and 2) followed by redemption of 10% of their units each year over the ten subsequent years. This treatment was meaningfully more favorable than any other category as the defendants' own behavior demonstrates.

The General Partner had to amend the Partnership Agreement in order to implement the Redemption Schedule. To that end, the General Partner decided to seek written consents from a sufficient number of unitholders to adopt the necessary amendments. Because the amendments terminated important rights belonging to the Basic Units, the General Partner decided to condition adoption of the amendments not simply on the support of a majority of all units, but on the support of a majority of the Basic Units. In reality, however, this protection was not much of a protection at all. Affiliates of the General Partner and at-will employees of Weeden controlled a majority of the Basic Units and did not face the same consequences from the adoption of the Redemption Schedule as the Outside Investors.

To obtain the consents, the General Partner sent out a letter, over Don Weeden's signature, on November 1, 2000. In the letter, Don Weeden explained the reasoning behind and origins of the Redemption Schedule as follows:

> Over the years, we have found that the best way to attract and retain qualified personnel is by giving them the opportu-

nity for meaningful equity participation. In light of the increasing competition in the securities industry for the most talented people, this is more true today than ever before. When we started in 1986, the breakdown of units owned was approximately 70% non-employee, 30% employee. With the passage of time, and as the firm has prospered, that ownership has changed to 75.42% employee, 12.28% ex-employees and 11.29% non-employee investors (and 1% General Partner—WSC).

The percentage changes have occurred, in part, because employees have left or retired. In addition, we have followed two practices which have shifted more and more ownership into employee hands: (1) periodic distributions of accumulated capital not necessary to run our business, and (2) annual issuance at book value of units to new employees and of additional units to existing employees whose role at Weeden was becoming more important.

Unquestionably, this policy of moving increasing ownership into employee hands at book value has been the right one. Witness our consistently high margin of profitability. Moreover, it has for the most part maintained Unit Holder return despite dilution.

In the future there will be an understandable acceleration in retirements on the one hand and a continuing dilution of non-employee investors on the other. *These prospects, combined with the need to address how the firm will continue to attract and retain first rate employees in a highly competitive market, led your Board to form a subcommittee of non-employee directors to examine these issues. The Unit Committee reported back to the Board with its unanimous recommendation that a different approach from before should be taken that both recognizes the past contribution of ex-employees and non-employee investors while at the same time moving fairly and deliberately toward an employee-owned firm.*

In order to achieve these objectives, the Unit Committee recommended, and the full Board unanimously approved, that certain amendments to the Partnership Agreement of Weeden Investors L.P. be submitted for approval by holders of Basic Units and Class A Callable Units. The primary amendment would convert everyone's original units (Basic Units) into Class A Callable Units, which have been the only type of unit (other than Incentive Units) issued by the Partnership since 1993. Class A Callable Units outstanding today equal 75.4% of total Basic Units and Class A Callable Units outstanding. By their terms, they can be called for redemption at book value by the General Partner, at any time, either as a class or selectively by holder at the discretion of the General Partner. Two other amendments would provide that the Partnership will not issue any additional Basic Units after December 1, 2000 and that Incentive Units, all of which are held by current employees, will be convertible into Class A Callable Units rather than Basic Units. Adoption of these amendments would be the first step in a longer term program to reduce and ultimately eliminate units held by non-employees.

This first step would require approval by a majority of outstanding non-callable units. While not required by the Partnership Agreement, the Board has determined that the amendments should be adopted only if they are approved by both (1) a majority vote of the percentage interests of the holders of Basic Units voting separately as a class, and (2) a majority vote of the percentage interests, in the aggregate, represented

by holders of Basic Units, Class A Callable Units and the General Partner (1%). Once approval is obtained, it is the Board's intention to commence a Class A Callable Unit redemption program that will apply to ex-employees, present and future; non-employee investors; and non-employee holders of less than 1000 Class A Callable Units. The program would be implemented in substantially the form described in the attached materials, which you should read carefully. If any of your Class A Callable Units would be redeemed under the program on December 31, 2000, the materials include information showing how the program would apply to you. *The Board retains the right, at any time prior to or after commencement of the program, in its sole discretion, to interpret and substantially modify the provisions of the program for any reason, including to adjust for fairness or to maintain the proper climate that continues to attract the very best talent to Weeden.*[17]

Noticeably absent from the letter is any disclosure that Don Weeden himself chaired the Unit Committee and had made the culminating report of the Unit Committee to the full board.[18] Equally absent was any indication that the approach recommended by the Unit Committee had in fact been the work product of a management team led by Cervoni and that the Unit Committee had merely blessed it, with only minor adjustments.

. The written consent process was a relatively informal one. Consents were to be sent back to Don Weeden himself, and any unitholder questions were to be directed to him as well. Although the secret ballot is not the rule in the business world, it is reasonable to infer that this procedure had a rather positive effect on the inclination of those in the electorate who were Weeden employees to vote yes. Given that employees controlled about three-quarters of the vote, I doubt that the General Partner worried about the late reporting of returns from the rural precincts.

Between the time that the board of the General Partner adopted the Redemption Schedule and the time of the consent solicitation, the application of the Redemption Schedule had already been altered. In one respect, the change was helpful to certain Outside Investors (i.e., those who had been employed by Weeden's predecessor, Mosely Hallgarten), because the board decided to treat years of service there as service to Weeden for purposes of the Redemption Schedule.

In other respects, the changes were altogether more self-serving and instigated by certain outside directors. For example, defendant DeMichele had been a board member since only 1996. He was concerned that his units could be redeemed over a five-year schedule and he bargained to be treated as if he had joined the board in 1990, when he first purchased Weeden units. DeMichele based this argument on the fact that he attended board meetings during this period and contributed his thoughts. Cervoni and Small supported him and the Unit Committee and the board eventually voted to treat DeMichele as if his board service started on June 1, 1990, the date when DeMichele first began attending board meetings. This change was very beneficial to DeMichele, as it gave him likely access to the 13–year Payout when he left the board. The change

---

17. JX 292 (emphasis added).

18. *See* JX 273 (minutes of September 2000 board meeting indicating that Don Weeden was Chairman of Unit Committee and that he presented the Unit Committee's recommendation).

was never disclosed to the unitholders when asked for their consents.

Likewise, outside director Frederick Weyerhauser sought preferential treatment for himself and his family. When the Weyerhauser family bought its units, Frederick Weyerhauser put his son on the Weeden board. His son had little interest in the firm and served only a brief time. Because of his son's service, Frederick Weyerhauser did not have 15 years of service on the board, a period that would have given him access to the 13–year Payout. Weyerhauser therefore sought to count the years when his son served because he himself also attended board meetings in that same period. Again, Cervoni and Small were obliging to Weyerhauser's request, which Weyerhauser addressed to Cervoni directly, rather than the Unit Committee, and Cervoni made the decision unilaterally without Unit Committee or board involvement. Again, the unitholders were not informed of the deviation from the Redemption Schedule they were being asked to approve and it appears that Cervoni, with the board's tacit approval, simply acceded to Weyerhauser's desires.

Another person was also treated as a 15–year director, John Driscoll, even though he was never a director at all. Driscoll had served as an informal "advisory member" of the board, to adopt Cervoni's term, because he was legally ineligible to serve as a director of the General Partner. In that capacity, Driscoll attended board meetings and received the same compensation as actual directors. As a definitional matter, Driscoll did not qualify as a director under the Redemption Schedule. Cervoni treated him, however, as having 15 years of directors' service and made this decision on his own, without Unit Committee or board involvement.

The decision was never disclosed to the unitholders.

This behavior is notable for another reason. Throughout this litigation, the defendants' lawyers have attempted to convince the court that book value is close to, if not the, fair market value of a unit of Weeden. But the defendants' own behavior has consistently refuted this proposition, as all of the defendants have acted as convinced believers that Weeden is a "buy at book" because its real value greatly exceeds that price, which is why all of the defendants wanted the longest possible payout schedules for themselves and their families.

In the disclosures to unitholders regarding the amendments and the Redemption Schedule, there was this forthright and accurate disclosure:

> The book value of Class A Callable Units is *unlikely to represent fair market value.* In accordance with generally accepted accounting principles, the Partnership carries the majority of its assets at market value (such as securities inventories); however, it also carries some assets on its books at historical cost, as adjusted for depreciation and amortization. Certain assets, such as computer hardware and equipment, may have a fair market value substantially lower than book value. Other assets, such as the Partnership's office building in Greenwich, Connecticut, have a fair market value substantially higher than book value. *Similarly, the going concern value of the Partnership,* assuming the continued ability of the Operating Partnership to retain and attract qualified key personnel (none of whom currently has a written employment agreement), *may far exceed book value.* Consequently, the price to be received upon redemption of Class A Callable Units at book value is likely to be less than the fair

market value of those units.[19]

For now, suffice it to say that the court concludes that this statement was accurate and that it is obvious that no rational person would sell a unit of Weeden for book value; each of the testifying defendants admitted as much. Perhaps that is the reason that a supermajority of the Outside Investors refused to consent to the amendments. Nonetheless, the amendments passed over their objections.

The motivations of some of the defendants regarding the Redemption Schedule were also influenced by changes in the General Partner's view about board membership. At the September 2000 board meeting, defendant Small presented a proposal regarding eligibility to serve on the General Partner's board. The exact nature of the policy remains somewhat obscure but seems to have had something to do with a retirement age for all directors, except Donald Weeden. What is more certain is that the proposal directly affected directors Jaffray, Weppler, and Weyerhauser, who eventually resigned at the December 15, 2000 board meeting and became "directors emeritus." These events gave those individuals an immediate interest in how the Redemption Schedule applied to departing directors.

## II. Analysis Of The Plaintiffs' Claims

The plaintiffs' claims fall into two basic categories. I will address them in the chronological order in which the facts underlying them arose.

The so-called "Dilution Claim" involves the issuances of additional units in the period 1997–2000. The plaintiffs allege that the General Partner (and its directors) breached their duties under the Partnership Agreement (and their default

fiduciary duties) by granting excessive awards of new units to employees, outside directors, and Favorites of Management and permitting them to reinvest distributions, while diluting Outside Investors.

The "Redemption Claim" is based on the assertion that the Redemption Schedule and the amendments that preceded it were adopted in breach of the Partnership Agreement and the defendants' fiduciary duties. By squeezing out the Outside Investors at prices less than fair market value, the defendants engaged in bad faith conduct.

For their part, the defendants contend that all of their actions were taken in the utmost good faith. Unlike a corporate board, moreover, the defendants argue that the General Partner and its board had far wider discretion to act in ways that were arguably unfair to some unitholders if the overall effect of those actions was genuinely believed to be advantageous to Weeden as a whole. The defendants say that the Partnership Agreement's terms reflect this broad discretion and that the plaintiffs are simply trying to wiggle out of their contractual bargain.

I now turn to the resolution of the plaintiffs' claims, starting with the Dilution Claim.

### The Plaintiffs' Dilution Claim

In an earlier decision, I explained the importance of §§ 6.10 and 6.11 of the Partnership Agreement to this dispute.[20] In this opinion, I rely upon the earlier interpretation I gave to those provisions, as have the parties. Those sections of the Partnership Agreement read as follow:

6.10 Liability of the General Partner.

(a) Neither the General Partner nor the partners or shareholders, directors,

---

**19.** JX 292 (emphasis added).

**20.** *Gelfman I,* 792 A.2d 977 (Del.Ch.2001).

officers, employees or agents of the General Partner shall be liable to the Partnership, Limited Partners, Assignees or to any Persons who have acquired interests in the Units, whether as Limited Partners, Assignees or otherwise, for errors in judgment or for any acts or omissions taken in good faith.

(b) The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the General Partner shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the General Partner in good faith.

6.11 Resolution of Conflicts of Interest.

(a) Unless otherwise expressly provided herein, (i) whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Limited Partner or any Assignee, on the other hand, or (ii) whenever this Agreement or any other agreement contemplated herein or therein provides that the General Partner shall act in a manner which is, or provide terms which are, fair and reasonable to the Partnership, the Operating Partnership, any Limited Partner or any Assignee, the General Partner shall resolve such conflict of interest, take such action or provide such terms considering, in each case, the relative interests of each party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles. In the absence of bad faith by the General Partner, the resolution, action or terms so made, taken or provided by the General Partner shall not constitute a breach of this Agreement or any other agreement contemplated herein or therein.

(b) Whenever in this Agreement or the Operating Partnership Agreement the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Operating Partnership, the Limited Partners or the Assignees, or (ii) in its "good faith" or under another express standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement, the Operating Partnership Agreement or any other agreement contemplated herein or therein. Each Limited Partner and Assignee hereby agrees that any standard of care or duty imposed in this Agreement, the Operating Partnership Agreement or any other agreement contemplated herein or under the Delaware Act or any other applicable law, rule or regulation shall be modified, waived or limited in each case as required to permit the General Partner to act under this Agreement, the Operating Partnership Agreement or any other agreement contemplated herein and to make any decision pursuant to the authority prescribed in this Section 6.11(b) so long as such action or decision does not constitute gross negligence or willful or wanton misconduct

and is not reasonably believed by the General Partner to be inconsistent with the overall purposes of the Partnership.[21]

In the earlier decision, I indicated that the General Partner's decision to issue additional Callable Units was governed in the first instance by a "sole discretion" standard.[22] As a consequence, the provisions of § 6.11(a) are inapplicable to the plaintiffs' Dilution Claim. Similarly, by its express terms, § 6.11(b) displaces other contractual, statutory, and legal standards of care or duties subject to a "Proviso."[23] That Proviso is that the General Partner's exercise of its sole discretion may give rise to liability or injunctive relief if the General Partner's "actions: (i) constitute gross negligence; (ii) willful or wanton misconduct; or (iii) [were] 'reasonably believed to be inconsistent with the overall purposes of the Partnership.'"[24]

This is a difficult standard for the plaintiffs as well as a linguistically challenging one for the court to apply. In order for the court to grant relief, the last part of the Proviso seems to require the court to find that the General Partner formed a conscious "reasonable" belief that its proposed actions would injure the Partnership. This is an odd construction at the very least, seemingly prepared by a member of a cold-blooded species rather than a breathing, feeling member of our species trying to capture in words an actual human state of mind.[25]

The oddity of this language is arguably very important to the resolution of the plaintiffs' Dilution Claim. As a general matter, the plaintiffs attack an extraordinarily large unit issuance program that took place between 1997 and 2000. They face certain problems in singling out that period as giving rise to liability on the part of the General Partner and its directors, however. These include the very broad discretion described above, which gives the General Partner wide leeway to consider whatever factors it wants and to ignore other factors unless its behavior is grossly negligent or (to simplify) consciously wrongful. By its plain terms, § 6.11(b) preempts any default standards of fiduciary duty, including the entire fairness standard.

Furthermore, the defendants are right in pointing out that the period 1997–2000 was not the first one during which the Partnership aggressively issued units. That had occurred in earlier periods, leading to a large increase in employee ownership. What is very different about the latter period is that per-unit distributions decreased as the total distributions did not keep pace with dilution and that the out-

21. Partnership Agreement §§ 6.10, 6.11.

22. *Gelfman I,* 792 A.2d at 989 & n. 19. This ruling was preliminary. But the plaintiffs have not disputed it seriously in their trial briefs, as they ignore the Certificate of Designations for the Callable Units, which gives the General further sole discretion to determine the recipients of new Callable Units. *See id.* at 989 n. 19.

23. Under the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), a partner's fiduciary duties "may be expanded or restricted by provisions in the partnership agreement." 6 *Del. C.* § 17–1101(d)(2).

24. *Gelfman I,* 792 A.2d at 987.

25. Presumably, the parties intended to draft the Agreement such that it would permit the General Partner to take any action or decision that it reasonably believed to be consistent with the Partnership's purposes, rather than forbid it only from taking actions that it reasonably believed to be inconsistent with the Partnership's purposes. I hope this decision will serve as a reminder of the perils of succumbing to the lawyerly impulse to utilize double negatives in an attempt to obtain a false sense of precision.

side directors did not suffer the dilution along with the Outside Investors.

Another problem afflicts the plaintiffs. Ironically, the extremely ad hoc and unsystematic behavior of the General Partner does not invariably aid the plaintiffs. If a simple negligence standard were relevant, it might well be very powerful evidence in their favor. But, as it is, many of the inconsistencies in the approach taken (e.g., permitting directors to reinvest pro rata to their ownership interests and giving out units to Favorites of Management) tend to refute any conscious plan of wrongdoing, at the very least one with any coherence.

And, as previously noted, key insiders like Cervoni, Small, and Weeden surely benefited from the new issuances but their overall profit share did not move in large ways that support much of an inference that their personal interests were paramount in their decisionmaking process except in a respect I will soon mention.

Lastly, as has been discussed, there was a rational basis for the General Partner to conclude that it needed to provide increased incentives to its workforce—a workforce that was also growing in number during the relevant period. For many of the units that were issued, therefore, an obvious reason exists in the record by which the General Partner can explain its exercise of discretion.

Because of these factors, the plaintiffs' post-trial briefs concentrate on a subset of the issuances, which are the most difficult to explain: the issuances to outside directors and to Favorites of Management. As to these issuances, the plaintiffs point to, among other factors:

- The lack of any rational deliberative process to evaluate the economic benefits to be received by the outside directors in comparison to the services they performed;

- The post-hoc nature of the explanations the defendants proffer for the inclusion of the outside directors and the fact that these explanations cannot coherently explain permitting the outside directors to reinvest pro rata to their ownership positions;

- The argument that the inclusion of the outside directors was in fact a quid pro quo for the outside directors' assent to the larger unit issuance plan for employees;

- The lack of any rational basis for giving units to Favorites of Management, especially given the supposed secrecy that reigns at Weeden regarding who gets units; and

- The lack of any consideration of the interests of Outside Investors whose per-unit profits were falling because of the dilutive issuances.

In response to this, the defendants make several arguments. As to the outside directors, they claim that the issuances can be justified by the past sacrifices some of them made by selling back units at book voluntarily at earlier periods, by their low cash compensation and lack of D & O coverage, and by their value to management. As to the Favorites of Management, the defendants argue that the tokens of fair treatment accorded them would be learned of by current employees, who would work harder in the hopes of receiving such favorable treatment themselves someday. Moreover, the granting of these units diluted the defendants as much as Outside Investors.

As an overall matter, the defendants note that the limited partnership context is a unique one and that the deliberative processes expected of a corporate board are not to be expected from a corporate General Partner, which acts through its management in many instances and not

always through its board. The fact that decisions entrusted to a General Partner's sole discretion were not the product of extensive board deliberation does not take them outside of the wide area of protected discretion left to the General Partner by the Partnership Agreement.

■ I admit to having some difficulty coming to grips with these competing arguments in applying the words of the Proviso. Words must be taken seriously and gross negligence has a stringent meaning under our law of entities, to wit, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness."[26] For that reason, I am reluctant to conclude that decisions are grossly negligent simply because they were made with dispatch or in an ad hoc manner. Many business decisions are necessarily made in that fashion and some sloppiness is negligence, not gross negligence. Here, nothing that was done strikes me as having the quality of gross inadvertence about it. Someone at a high level at the General Partner knew about each aspect of the issuances that the plaintiffs challenge. In that vein, I also find it unnecessary that every decision of the General Partner be made by its board as opposed to by key managers. The General Partner, as a corporate body, and not its own board, was the General Partner. For all these reasons, I am unable to conclude that any of the issuances to the outside directors or the Favorites of Management resulted from gross negligence.

■ And, as an overall matter, I cannot find that the issuances to employees resulted from conduct outside the scope of the General Partner's discretion. Although the issuances to employees were very substantial, the marketplace within which those issuances took place and the prior hiatus on issuances provide a rational basis for them. The key employee-directors could have used other means to enrich themselves if they wished to take more of the Partnership pie for themselves. In the main, they did not grab a materially greater share of the pie; other employees (including new employees) did. While the plaintiffs would have me think the worst about the motives behind these issuances, their arguments do not persuade me on this (close) point.

■ By contrast, what the plaintiffs have convinced me of, is that the decision to permit the outside directors to reinvest their capital distributions in new units in 1997 and 1998 did arise from motives that pulled that exercise of the General Partner's discretion outside of the realm of permissibility. When Cervoni proposed a very large issuance of new units to employees, what did the outside directors do? They sought to protect themselves. Their self-interested behavior is an important insight into their beliefs, which is that whatever profit-producing effect would come

---

**26.** William T. Allen et al., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law,* 56 Bus. Law. 1287, 1300 (2001). *See also Tomczak v. Morton Thiokol, Inc.,* 1990 WL 42607, at *12 (Del.Ch. Apr.5, 1990) ("In the corporate context, gross negligence means 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' ") (citing *Allaun v. Consol. Oil Co.,* 147 A. 257, 261 (Del.Ch. 1929); *Gimbel v. Signal Cos.,* 316 A.2d 599, 615 (Del.Ch.), *aff'd,* 316 A.2d 619 (Del.1974); *Solash v. Telex Corp.,* 1988 WL 3587 (Del.Ch. Jan.19, 1988)); *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Service of Cincinnati, Inc.,* 1996 WL 506906, at *14 (Del. Ch. Sept.3, 1996) (stating that to prevail on a claim of gross negligence and gross mismanagement, the plaintiff must "plead and ... prove that [the defendant] was 'recklessly uninformed' or acted 'outside the bounds of reason' " (citations omitted)), *aff'd,* 692 A.2d 411 (Del.1997) (TABLE).

from the new unit issuances would not make up the costs to the outside directors—as unitholders—coming from the expected dilution. This instinct for self-protection was exercised without any corresponding consideration for the interests of the Outside Investors, who faced the same threat.

Now, it is of course true that the General Partner (and implicitly its directors) were not duty bound to consider any particular interests in issuing new units. But what it was duty bound to do was to refrain from willful misconduct or actions that it knew not to be in the best interests of the Partnership.

The reason for the unit issuances to employees is rationally explained in the record. By sharp contrast, the reasons advanced by the defendants for including the outside directors were not, I conclude, the ones that motivated their inclusion in the opportunities to repurchase in 1997 and 1998. The argument that the inclusion of the outside directors was designed to make up for their willingness to sell back units at book value in the past founders on the facts: (1) that not all of the outside directors had in fact sold back their units (and even the participating directors varied in their degree of "sacrifice") and (2) that several Outside Investors had made the same contribution and were not given the opportunity to reinvest. The argument that the opportunity to reinvest was somehow an ordinary director compensation decision finds no record support, as the opportunity to reinvest was proportionate to the directors' pre-existing ownership and not to any factor connected to actual board service, the opportunity was extraordinarily valuable in comparison to the duties expected of board members, and there is no record evidence that the

decision to permit them to reinvest was in fact justified by the whole board as fair recompense for their work as directors.

I find that the defendants' reasons are pretextual, litigation-driven afterthoughts designed to shield the real reason for the outside director's inclusion in these opportunities to reinvest, which is that it was a quid pro quo for the outside directors' approval of the new employee units proposed by management.

I so conclude in no small part because the business reasons that justified increases for employees did not extend to the outside directors. The outside directors, by their own account, had only non-burdensome and non-time-consuming duties. They had little to do with Weeden's profitability, current or future. Small's trial testimony that he found himself relying more and more on the board was belied by his proposal to replace many of the outside directors in autumn 2000,[27] a proposal that was adopted coincident with the consideration of the Redemption Schedule.

Rather than being motivated by proper Partnership purposes, I conclude that the decision to include the outside directors in the opportunity to reinvest in 1997 and 1998 was based on two sets of motivations: 1) a desire on the part of the outside directors to immunize themselves, but not the Outside Investors, from the adverse effects of the large new unit issuances proposed for employees; and 2) a desire on the part of the employee-directors to secure the support of the outside directors for the proposed new units for management and the employees. That is, the issuances to the outside directors were not believed to be useful for the Partnership itself as incentives or as fair compensation for director services. Instead, the issu-

---

**27.** Notably, this testimony largely involved director Sharp and the legal advice he provid-

ed, for which his firm was separately compensated.

ances were useful only as a bargain between management (on behalf of itself and the other employees) and the outside directors (on behalf of their own personal interests) about the division of the Partnership pie. Left out of this bargaining process was any consideration of whether the issuances to the outside directors were in the Partnership's interests.

In my view, this type of bargain falls outside of the protected range of discretion left to the General Partner. A conscious decision to enrich the outside directors in order to facilitate their support for issuances of large numbers of new units to employees amounts to conduct that the General Partner must have reasonably known was inconsistent with the purposes of the Partnership.

This is a conclusion that I have little doubt the defendants will adamantly protest, claiming that I have misread their characters and intentions. I regret having to come to such a conclusion but the record convinces me that this was the real motivation. Surely, the defendants will claim that they intended no further harm to the Outside Investors but their own conduct belies their claim not to have known of the harm that further dilution would do. The outside directors demanded the opportunity to reinvest precisely so as to stave off personal harm to themselves from the new issuances to employees. By holding themselves harmless, however, the outside directors (as sophisticated persons) knew that the effect would be to dilute the Outside Investors even further. The employee directors understood these consequences, too, yet went along to grease the skids for the management and employee issuances. This sort of logrolling among fiduciaries is not consistent with the Partnership's purposes.

I reach a contrary conclusion as to the modest unit issuances to the outside directors in 1999 and 2000. These were relatively small in amount and can be seen (unlike the earlier reinvestment opportunity) as a fair part of their compensation for the year.

From the issuances to outside directors, I turn to an odd category, that of the Favorites of Management. Unlike the situation with the outside directors, it is difficult to perceive any illicit self-interest in this category of issuances, aside from the desire to be thought of well by certain former employees. I also recognize that the General Partner had a policy of keeping who got units private and that this undercuts to some extent the defendants' explanation that the inclusion of these Favorites in the opportunity to reinvest sent a good signal through the ranks. But, given the high bar for holding the defendants liable in this context, I am constrained to find for the defendants on this point.

I am simply unable to conclude that the General Partner did not believe that its favorable treatment of the Favorites advanced the interests of the Partnership. By permitting persons who had performed loyally and productively for the Partnership over the years the opportunity to reinvest, it is rational to expect that those persons would appreciate that consideration and continue to be loyal to the Partnership. That appreciation could lead those persons to speak well of the firm, to divert opportunities the firm's way, and otherwise be supportive. These positive feelings could translate into potential new business for the firm and, if, as is likely, they were to become known by the current workforce, they might reflect well on Weeden as an employer.

However quaint this kind of thinking might seem to a cynical mind, I am unpersuaded that anything illicit undergirds

these issuances. Moreover, these issuances were in no sense inadvertent and there is a rational (if strained) logic behind them. Put simply, I cannot conclude that the units were issued to Favorites as a result of either gross negligence, willful or wanton misconduct, or a conscious decision to harm the Partnership.[28] Rather, the General Partner appears to have been expressing gratitude to the Favorites, with the implicit expectation that this good karma might well eventually translate into tangible benefits to the Partnership.

### The Plaintiffs' Redemption Claim

■ The Redemption Claim implicates a different contractual standard than the Dilution Claim. The General Partner's decision to recommend the amendments and the Redemption Schedule was not one within its sole discretion under the Partnership Agreement. Moreover, the defendants concede that the General Partner and its directors faced a conflict between their own personal interests and those of the Outside Investors. As a result, § 6.11(a) of the Partnership Agreement was implicated because there was a conflict between the "General Partner or any of its Affiliates, on the one hand, and . . . any Limited Partner . . ., on the other hand." [29]

■ When § 6.11(a) applies, the General Partner is only relieved of its duties under default principles of fiduciary duty if it complies with the standard of duty set forth in § 6.11(a) itself. This proposition flows from settled principles of Delaware law, which require that any restriction on the fiduciary duties of a general partner be stated clearly in the partnership agreement and that the general partner comply with the substitute contractual standard of conduct as a prerequisite to taking advantage of the contractual alleviation of his fiduciary duties.[30] In this case, those principles require that the General Partner and its directors have acted as follows:

> [T]he General Partner shall [have] resolve[d] such conflict of interest, tak[ing] such action or provid[ing] such terms considering, in each case, the relative interests of each party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles. In the absence of bad faith by the General Partner, the resolution, action or terms so made, taken or provided by the General Partner shall not constitute a breach of this Agreement or any other agreement contemplated herein or therein.[31]

---

28. The defendants have argued that certain of the plaintiffs are barred from pressing the Dilution Claim by the doctrine of laches. Because I find for the plaintiffs on the Dilution Claim only as to the units issued to outside directors in 1997 and 1998, I need not reach the defendants' laches defense. No disclosure of these issuances was ever made by the General Partner, and there was no inquiry notice of that aspect of the Dilution Claim provided to any member of the Dilution Class, and therefore the defense fails as to even those certain plaintiffs the defendants allege had notice of the significant dilution caused by the issuances to employees and who harbored concern about whether that dilution was proper.

29. Partnership Agreement § 6.11(a).

30. *See, e.g., R.S.M. Inc. v. Alliance Capital Mgmt. Holdings L.P.,* 790 A.2d 478, 497–98 (Del.Ch.2001); *Gotham Partners L.P. v. Hallwood Realty Partners, L.P.,* 795 A.2d 1, 31–33 (Del.Ch.2001), *aff'd in relevant part and rev'd in part on other grounds,* 817 A.2d 160 (Del. 2002).

31. Partnership Agreement § 6.11(a).

The plaintiffs argue that the General Partner did not comply with this contractual standard. Rather than considering analogous practices used by corporations in situations when controlling parties wish to squeeze out certain equity holders, the General Partner's management simply came up with a back-of-the-envelope plan that squeezed out many, if indeed not all, of the Outside Investors for less than fair market value. Rather than looking at the procedural protections used by corporations in these situations, which often involve the use of entirely independent negotiating committees with independent advisors, the General Partner and its directors permitted management to drive the process and had Don Weeden chair the Unit Committee. If, say the plaintiffs, the General Partner had taken the time to consider "customary or accepted industry practices" or, as important, to consider the "interests" of the Outside Investors, it would have recognized that there was absolutely no precedent for squeezing out equity holders for a price below fair market value.

In response to this argument, the defendants hew to the line that a limited partnership is fundamentally different from a corporation. In their view, the Wall Street rule is "book in, book out" and they simply adopted it after-the-fact and applied it retroactively to clean up a messy situation. Because, the defendants say, the situation they faced was not one other limited partnerships had confronted, there were no "customary or accepted industry practices" for them to draw on in shaping the process they used or the substantive choices they made. Indeed, the only real custom they say is clear is that book value is the common currency received by retiring or departing partners in personal services firms in the securities

industry. Because the Redemption Schedule was modeled on that custom, the General Partner used the only prevailing custom anyone has been able to point to in the record.

For the following reasons, I believe that the plaintiffs have the better of this argument and that the General Partner did not satisfy its duties under § 6.11(a). By its plain terms, § 6.11(a) imposes a process requirement upon the General Partner. By requiring the General Partner to surface the interests of the various constituencies affected by a conflict decision, § 6.11(a) prods the General Partner towards reasoned decisionmaking and fair treatment. By requiring the General Partner to consider customary industry practices and standards, § 6.11(a) encourages the General Partner to understand the context in which it is making its decision and forces it to confront the way in which the industry as a whole does business. Here, it is clear that the General Partner and its board never referred to § 6.11(a) in developing their process to consider the Redemption Schedule. That lack of conscious consideration of the relevant standards shows that those standards were not met.

The process used by the General Partner to develop the amendments and the Redemption Schedule did not, in my view, fulfill the requirements of § 6.11(a). I start with the lack of any reasonable consideration of the legitimate expectations of the Outside Investors. As Cervoni admitted at trial, he could not recall *any* documents showing "any specific measure that was taken by the board to consider the interests of the basic unitholders who were not employees, not directors, and were going to have those units converted and redeemed." [32] In that vein, the record reveals no serious consideration of the fact

---

32. Trial Tr. at 681.

that the original Outside Investors bought Basic Units that were not callable and that the Partnership Agreement (before its amendment) restricted the ability of the General Partner to squeeze out Basic Unitholders, and in the very limited circumstance when that could occur, required the payment of fair market value. The board never appears to have considered a price other than book value. Nor did it ever consider the option of treating all Basic Units equally, regardless of who held them.

Likewise, I see nothing in the record that indicates any serious consideration of the interests of former employees who owned Basic Units. Why, having received Basic Units with no strings, should such Outside Investors face the deprivation of their units based on the retroactive application of a schedule tied to their years of employment? After all, the General Partner and its directors have argued that Weeden used equity as a key incentive to productivity. Why was it fair to deprive these former employees of Basic Units that presumably encouraged them to work hard when they were on the payroll and that were, by their plain terms, not subject to involuntary redemption, except in unusual circumstances and then only at fair market value? These are questions that I am convinced were never thoughtfully posed and considered.

In the same vein, no meaningful consideration seems to have been given to the feature of the Redemption Schedule that hinged a former employee's payout schedule on whether the employee had joined a competitor firm. It is the defendants who have stressed that Weeden did not use written employment contracts and therefore needed a strong equity program for retention purposes. The defendants therefore knew that former employees were free to compete so long as they did not violate any statutory or common law duty by misappropriating trade secrets. The defendants also knew, because of the plain language of § 7.3 of the Partnership Agreement, that limited partners had a right to compete with Weeden. What consideration did they give to the interests of former employees like Ralph Giorgio who had joined competitors (or others who might wish to do so) in adopting a Redemption Schedule that penalized them after-the-fact for engaging in conduct that was contractually permissible at the time they received their Basic Units? I am persuaded that, like the previously mentioned issues, the General Partner and its directors gave no rational consideration to these interests.

In one instance, the Unit Committee did dilate briefly on the interests of one group of Outside Investors: those who owned less than 1000 units.[33] Cervoni proposed that these small holders be given a premium to book for being taken out right away. The Unit Committee said no, let's take them out at book. In coming to this conclusion, they appear to have taken no time to evaluate the actual cost-savings that would be achieved for taking these small holders out at what the Unit Committee members knew to be a price well below fair market value.[34]

---

33. There is some evidence that certain outside directors spoke to friends of theirs who were Outside Investors to glean their reaction to the Redemption Schedule. This slight evidence does not, in my view, overcome the absence of any serious rational deliberation by the board of the interests at stake, or the board's failure to engage in any quantification of economic effects of the Schedule they were considering.

34. Defendants note that it is common for firms to make odd lot tender offers to reduce the costs of having small holders. That is, of course, true. These are also voluntary transactions. Cash-outs of fractional units in the

Turning to industry practices, I find the defendants' arguments to be strained. For starters, the argument that there is no precedent in the industry for the situation Weeden faced and therefore that § 6.11(a) was satisfied because the General Partner could not consider practices that did not exist is not one that persuades me. A reasoned search for industry practices that revealed the absence of guidance would itself have been revealing. That is, had the General Partner forthrightly focused on the absence of any industry practice whereby existing equity partners with contractual protections could be forcibly deprived of their equity at book value, that focus would have been highly relevant to its deliberative processes and might have persuaded the board to a different course of action. Relatedly, I do not believe that § 6.11(a) is so restrictive that it implicitly authorized the General Partner to blind itself to the practices used by all industry players, be they corporations or limited partnerships or other types of entities, in forcibly depriving equity holders of their ownership positions. A review of such practices could legitimately have taken into account the procedural protections often used to safeguard minority interests in analogous contexts, such as special committees of unconflicted fiduciaries and the payment of fair value as the price for requiring exit. In this case, I see no evidence that the General Partner conducted a genuine review of such practices itself or sought advice from experts.

In this regard, I find the defendants' "book in, book out" argument revealing of the inadequacy of their compliance with § 6.11(a). For one thing, there is no evidence that the General Partner made a rational survey of industry practices and surfaced the book in, book out concept as a prevailing one that had been retroactively put in place at several firms. At best, the General Partner and its directors drew on "lore" of the industry, untethered to any specific facts about particular situations. Relatedly, the defendants themselves admit that the firms that have a book in, book out approach typically do so by contract. These firms have standard employment and partnership contracts that tie continued equity participation to continued service, and that permit redemption at book value upon departure on established schedules, which may be shortened if the departing person competes. Established practices of that kind are obviously quite distinct from the situation that existed at Weeden, in which the General Partner was seeking to retroactively impose such conditions on equity holders who were not subject to them, while at the same time providing much more generous treatment for itself and its affiliates.

Put simply, a serious look at industry book in, book out practices would likely have revealed a serious fairness gap between the prospective practices of industry firms and the retroactive approach the General Partner was considering. Such a look might also have revealed situations when securities firms had not prospectively contracted in this manner and what techniques they used to procure the voluntary assent of the equity holders to give up their units.

The ad hoc and cursory process employed by the General Partner simply did

---

corporate context—a fair analogy—come with an accompanying duty to pay fair value. *See* 8 *Del. C.* § 155(2) (providing that where corporation does not issue fractional shares, it may "pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined"); *see also Applebaum v. Avaya, Inc.*, 805 A.2d 209, 215–18 (Del.Ch.) (discussing meaning of term "fair value" in § 155(2)), *aff'd*, 812 A.2d 880 (Del.2002).

not involve any rational consideration of the interests and considerations just discussed. These interests and considerations were relevant under § 6.11(a) and especially to those—the Outside Investors—against whom the General Partner's inclinations were already biased. That is, the General Partner and its directors went into the process of considering the Redemption Schedule holding the belief that the firm did not need cash capital, that the firm should be owned as much as possible by persons who worked for Weeden as employees or directors or were family members of someone who was, and that Outside Investors who did not hold such status should be relieved of their ownership positions. Believing, as I find, that this was the philosophy of the General Partner and the directors going in, they should have been especially sensitive to the need to consider the interests of these Outside Investors, who were likely to (and in fact ultimately did) come out on the losing end of the Redemption Schedule process.

▇▇▇ Because I conclude that § 6.11(a) was not complied with, default standards of fiduciary duty apply. In my view, these involve the application of the entire fairness standard. The process that the General Partner and its directors embarked upon involve a stark clash between the interests of current employees and directors and the Outside Investors. The General Partner and its directors were on one side of this conflict and the Outside Investors were on the other.

▇▇▇ Both the process employed and the substance of the decision reached fail the exacting standard of entire fairness.[35] As to process, the Unit Committee was comprised of both management and outside directors, each of whom spent more time considering their own interests than in considering the interests of Outside Investors. The vote process used was an illusory protection at best and was tainted by, among other things, the failure to disclose the exact composition and nature of the Unit Committee, the affirmative misdisclosure of the Unit Committee's membership, the role of management in preparing the Redemption Schedule, and the self-serving exceptions from the literal application of the Redemption Schedule the outside directors had procured.[36]

---

**35.** For a leading case on this standard, see *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983).

**36.** The defendants argue that estoppel bars the claims of those members of the Redemption Class who voted in favor of the amendments because a class representative testified that his reason for voting no was based on the substance of the Redemption Schedule's effect and not on the committee's composition. This is not a persuasive argument. The burden of proving that the class members who voted yes are barred by estoppel rests on the defendants and requires that they show that they disclosed all material facts. The disclosure that was made was misleading in key respects, including the failure to disclose Donald Weeden's role, the role of management in the Committee process, and the role of management as the key authors of the

Schedule. The testimony of a dissenting limited partner about his reasons for voting no do not help the defendants show that the material information they failed to disclose would not have been important to those limited partners who voted yes and would not have changed their vote. The defendants have failed to meet their burden.

In their pre-trial brief, the defendants also argue that the doctrine of ratification is applicable. Because the disclosures were materially deficient, the defendants cannot prove ratification. More fundamentally, the fact that the Basic Unitholders as a so-called class approved the amendments does not aid the defendants. As they well know, the defendants, their affiliates, and at-will employees of Weeden owned most of the Basic Units. The defendants afforded themselves the most favorable treatment under the Redemption Schedule, and the defendants and current em-

Notably, the failure in process also includes a total absence of any attempt to determine the fair market value of a Weeden unit and the relationship of that value to book value. Each of the defendants knew full well that book value was lower than fair market value but none bothered to ensure that the board rationally and fairly took value considerations into account as they affected the Outside Investors.

As to substance, it is absolutely clear that the General Partner and the directors approved the taking of units from Outside Investors at less than fair market value. One need not ponder whether the common law of limited partnerships should incorporate the corporate concept of fair value from the appraisal context here; what is clear is that the General Partner and the directors did not even accord traditional economic notions of fair market value to the Outside Investors. What I find remarkable is that the defendants clearly knew that this is not a deal they would want for themselves. Each personally sought the longest possible payout period they could get, with some of the outside directors asking for special treatment to get the 13–year Payout. Not one defendant would have accepted book value for their units. Yet, each was willing to take all of the units of small-holder Outside Investors at book value immediately. Not one of the long-serving defendants wanted

a payout period fewer than 13 years for themselves. Yet, each was willing to subject former employees to mush shorter payout periods. Not one defendant would have thought the immediate redemption of Ralph Giorgio's Basic Units would have been fair for themselves, but they inflicted it on Giorgio.

Let's just examine it starkly: The defendants consciously chose to deprive Outside Investors of their units for less than fair market value. They knew in their bones they were doing this. The fact that they did not even take steps to determine fair market value does not help them, it simply underscores the sloppiness of their process and their predominant interest in the welfare of only those unitholders who currently worked as employees or directors of Weeden.

Alternatively, even if the General Partner and its board's conduct could be viewed as satisfying § 6.11(a)'s procedural requirements (which I believe it cannot), the plaintiffs have convinced me that the defendants' conduct falls outside the protection afforded by § 6.11(b). Arguably, I could rest this conclusion on grounds of gross negligence alone. For the defendants to have consciously chosen to deprive unitholders of their property at a price they knew to be below fair market value, but to have made no exploration at all of precisely how far below fair market value the book value in fact was is a failure

---

ployees had large holdings of Callable Units, the economic value of which they could enhance by favoring the adoption of the amendments. The idea that this vote thereby binds the Outside Investors is not one consistent with our state's law of ratification, which requires that there be an informed vote of the relevant class that is untainted by material conflicts. *See, e.g., Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 900 (Del.Ch.1999) ("Only votes controlled by stockholders who are not 'interested' in the transaction at issue are eligible for ratification effect in the sense

of invoking the business judgment rule rather than the entire fairness form of review. That is, only the votes of those stockholders with *no* economic incentive to approve a wasteful transaction count."). Because the defendants' plan did not treat all Basic Unitholders equally as to their Basic Units, the very assumption upon which the doctrine of ratification rests—that the vote of an informed majority of aligned stockholders might preclude claims by dissenting, but still aligned stockholders—is absent here.

in care that is extraordinary and can be fairly characterized as gross in nature.

Contributing to that conclusion is the absence of any persuasive evidence that the defendants explored any less punitive means to accomplish their ends. In these circumstances when the defendants were considering the involuntary squeeze-out of certain partners, it would seem that a consideration of less draconian methods to accomplish the General Partner's goals is a minimal expectation. For example, Weeden had issued a very large number of Callable Units during the preceding decade. Each one of these Callable Units was already redeemable at book value at the General Partner's discretion, an exercise in discretion that would upset no holder's legitimate equitable or legal expectations. The immediate redemption of those Units held by, for example, the outside directors who were retiring would free up units to give to employees and reduce any "need" to squeeze out Outside Investors at less than fair market value.

Instead of dilating at any rational length on issues of this sort, the defendants engaged in cursory (and apparently, virtually unremembered and undocumented) sessions at which they blessed Cervoni's handiwork. I cannot discern from the record any rational evaluation of the interests of the Outside Investors in comparison to those favored by the Redemption Schedule.

In this regard, I note the constant and rather shocking refrain of the defendants, which is that the Outside Investors had gotten their fair share already. For those who had contributed cash to invest, they had gotten a healthy return and ought to be happy to have their units taken from them at less than fair market value, as a sort of appreciation for management's past performance. As to those Outside Investors who were former employees, the defendants' attitude is that they should recognize that it is the current, hard-charging employees who are delivering value and should get the returns, not the workhorses who've gone out to pasture, and that the former employees should accept their treatment gracefully.

This logic, however, applies with equal force to the outside directors, especially the ones who were retiring contemporaneously with the adoption of the Redemption Schedule. By the defendants' own evidence, it is clear that the outside directors were never drivers of cash flow at Weeden. When they left, the defendants' own logic suggests that they should have left all their units behind at book immediately and let the new generation of value drivers receive their just desserts. This was even more so as to the large number of Callable Units held by these outside directors, Units that the Outside Directors had no credible expectation of holding for any particular period of time.

Rather than adhere to a foolish consistency, however, the outside directors departed from their own logic vigorously and selfishly. Several of them specifically asked for exemptions from the Redemption Schedule to ensure that they would receive the 13–year Payout, not only for their Basic Units but for their Callable Units, which were subject to immediate redemption at book value. Yet, each supposedly knew that his cash capital was not needed by the firm. Yet, each knew that the real drivers of value who needed equity incentives were not outside directors—particularly former ones—but current salestraders. Yet, each knew that the firm needed (or so they said) to recycle units to give to current employees, a need that could be aided if the General Partner redeemed the outside directors' Callable Units immediately, at the very least as to those leaving the board.

What emerges from the record is a process in which a group of insiders (managers and directors) placed their own personal self-interest above their contractual duty to refrain from bad faith conduct towards the Partnership. I accept that it might be conceived of as a proper objective to clean up the equity structure of Weeden and to put in place a clearer incentive system going forward. I also accept that such a clean-up could, in good faith, involve the planned departure of equity holders who were not employees or directors.

What I do not accept could occur in good faith was that those objectives would be pursued with the callous disregard for the interests of the Outside Investors that is reflected in the Redemption Schedule that resulted. This callous disregard is made even clearer by the fact that the defendants (as managers and directors) benefited themselves at the same time as they were penalizing the Outside Investors. Although it is true that the defendants were also subjecting their own Basic Units to treatment as Callable Units, they did so under a system whereby those in power (themselves) reserved the right to change the Redemption Schedule as they deemed appropriate. Most important, the defendants also benefited from the Redemption Schedule because that Schedule, if adhered to, turned their Callable Units into something more valuable, because they now had a lengthy tail period (13 years for most of the defendants) that would follow the defendants' retirement from Weeden.

Although the defendants were not required to engage in a mathematical calculus of how the Redemption Schedule would translate into expanded profits at Weeden from the incentive effects it created, their failure to do anything that even approaches this further undercuts the credibility of their justification for their decisions. So too does their failure to make

any rational calculation of the winners and losers from their plans contribute to my conclusion that the defendants acted in bad faith. The defendants were too sophisticated not to know that they were engaged primarily in a pie-cutting and not a pie-growing exercise, and that they had carved out larger slices for themselves at the expense of smaller slices for the Outside Investors.

At the most fundamental level, however, I rest my conclusion that the defendants acted in bad faith on a simple proposition. I do not believe that the defendants could in good faith decide that Weeden would be better off if some of its investors simply had their units taken away at less than a fair market value price. Many businesses are dependent on their employees as drivers of value and no longer need the cash originally invested by their equity holders. In pursuing the objectives of the firm, however, a governing board cannot act unfairly on the dream of how good it would be if some of its owners—for whose benefit the firm is to be managed—simply departed, leaving ownership in the hands of the rest. Rather, if the future of the firm as a profit-generating entity requires the departure of some owners, the minimally acceptable standard of good faith action would seem to require, in the absence of a contractual right to force out certain owners at a different price, that the firm pay any equity owner being forced out fair market value for their equity share. For a General Partner to knowingly deprive an equity partner of her partnership interest for less than what it is worth without a pre-existing contractual right to do so is, by an American's definition, bad faith action. That is precisely what occurred here.

The inference of bad faith is especially strong here for another reason: The defendants cannot point to any rational justi-

fication for the extremely punitive course of action they took. The financial health of Weeden was unquestionable and there was no exigency that required that the Outside Investors be treated so roughly, at a time when the defendants were dealing with themselves so generously.[37]

For all these reasons, I conclude that the defendants are liable to the plaintiffs on the Redemption Claim. Thus, I now turn to the question of the appropriate remedy.

### III. *The Remedy*

The just remedy for the defendants' breaches of duty in connection with the Dilution and Redemption Claims is fairly straightforward.

As to the Dilution Claim, the relevant class of plaintiffs, the so-called Dilution Class, shall receive a damage award that reflects the increased distributions they would have received during the period before 2001 had the outside directors not been permitted to reinvest their returned capital in 1998.[38]

As to the Redemption Claim, the relevant class of plaintiffs, the so-called Redemption Class, shall be awarded a sum approximating the court's assessment of fair market value for each of the Basic Units they held before the Redemption Schedule was implemented.[39] Each member of the Redemption Class may elect to give up their remaining Basic Units and accept this sum, minus an appropriate reduction for the distributions they have already received and any amounts they were paid upon redemption of their units since the adoption of the Redemption Schedule, or elect to keep their remaining units and remain subject to the Redemption Schedule, protected by a judicial order that the Schedule may not be changed negatively as to them.

In so concluding, I reject the defendants' argument that the appropriate remedy for liability on the Redemption Claim ought to be rescission of the amendments and Redemption Schedule. That argument is an odd and nihilistic one, made more as a rhetorical flourish emphasizing the defendants' view that the plaintiffs' Redemption Claim has no merit and that it is ludicrous to think that this court could find them liable. Given that the defendants have made it clear that the Outside Investors have no future at Weeden, their desire for rescission is not a weighty consideration. Far more fitting at this stage is a monetary damages remedy tied to fair market value.

I select fair market value because I am reluctant to import into the limited partnership context all the artificial complexities of our corporate appraisal jurisprudence.[40] Fair market value is also a

---

37. And, by defendant Small's own admission, none of the key managers at Weeden were leaving any time soon. Therefore, the supposed rationale that the imminent threat of key managerial selective departures justified the Redemption Schedule lacks substance. Furthermore, if that threat was real and needed to be addressed through new unit issuances, the extension of the life of Callable Units cuts against meeting that need.

38. As noted above, *see supra* note 6, the plaintiffs do not seek damages in connection with the 1997 issuances. I therefore do not con-

sider those issuances in shaping the appropriate remedy.

39. In addition, a judicial order shall prevent the defendants from negatively changing the treatment of the class members' Callable Units (which are held by only a few class members) under the Redemption Schedule.

40. *Cf. Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *8 & n. 32 (Del. Ch. Nov.27, 2001) (applying fair market value standard for conversion claim and declining to import the fair value concept under 8 *Del. C.* § 262 into the conversion context).

standard that relates to the facts of this case, as this was the pre-amendment price at which Basic Units could be taken in the event the General Partner owned 90% or more of the units under the Partnership Agreement.

The record is not ideal to determine fair market value, but then it often isn't. Some of the factors that hamper me include the fact that Weeden was not a publicly traded firm and that there was no active market in its units. Very few transfers had occurred over the years and there were contractual limits on transfer. On the other hand, Weeden unitholders have little desire to transfer their units because the firm pays out almost all of its net income every year in the form of distributions. This is a reliable practice that is expected to continue into the future. One obvious reason for this emerges from the defendants' own submissions: Profit payouts on equity are a critical part of the employment package at Weeden. Because these payouts are regular and substantial, the lack of an active trading market is far less important a factor in valuing Weeden units than it would be in valuing other kinds of equity interests.[41] Furthermore, because Weeden pays out so much of its profits every year, its book value does not bear the same relation to its actual economic value as book value does for other broker-dealers.[42] Most other broker-dealers have far more retained capital and therefore higher book values on an apples-to-apples basis than does Weeden.

Because Weeden is a relatively unique firm and because it has had steady and growing profitability, I tie my determination of fair market value to a capitalized cash flow model presented by George Cassiere, a qualified appraisal expert, presented by the plaintiffs.[43] The least aggressive version of the model presented by Cassiere—that is, the version most favorable to the defendants—is based on a 20.57% cost of equity capital and modest growth assumptions [44]—both factors which could be reasonably adjusted to justify a higher value. Using this conservative approach produces a value of $24.61 per unit.[45]

Cassiere's capitalized cash flow model was his secondary method, as he based his opinion of what he called "fair value" primarily on a comparable companies

41. Indeed, the defendants' own submissions stress how consistently Weeden has out-performed its peers in its returns on equity.

42. See, e.g., JX 363 Ex. M (expert report noting that "Weeden Investors' avg. Payout ratio of 90% vs. 4% avg. for Comparables leads to distorted asset and book multiples").

43. The defendants did not present their own estimate of fair market value. Instead, they simply presented the testimony of Alan McFarland, an experienced investment banker. McFarland's testimony mostly focused on his perception that book value was a common value metric for Wall Street firms and that the book in, book out principle was widely used. McFarland was unable to point to any instance when that principle was retroactively applied to unitholders who had not contractually agreed to give up their units for book value when certain events occurred (e.g., a departure from employment). Moreover, McFarland's testimony was grounded entirely in his own experience and anecdotally gained knowledge rather than any academically rigorous survey of industry practices. Aside from that subject, McFarland's testimony involved a critique of the valuation work done by the plaintiffs' expert, Cassiere. McFarland did not perform his own valuation and accepted many of Cassiere's assumptions in conducting some of his own analysis, such as his estimate of the per-unit value to an Outside Investor of being redeemed at book value over a ten-year period.

44. Zero percent from 2000 to 2001 and 4.28% thereafter.

45. The defendants and the plaintiffs quibble over six cents. I use the defendants' lower estimate of what Cassiere's model produces.

methodology. I consider things from the opposite perspective, believing Cassiere's comparable companies analysis to be supportive of the value indicated above. Contrary to what the defendants contend, Cassiere's comparable companies analysis was generally a sound one. Although the defendants are correct in contending that Cassiere's resulting value indicates that Weeden is worth a much greater multiple of book value than the comparable firms, a ready explanation for that emerges: Weeden pays out over 90% of its income annually and the comparison firms pay out less than 5%.[46] Relatedly, Weeden is also less leveraged than the comparison firms. The value that Cassiere's comparable companies analysis generated, which is $24.67 per unit, buttresses my initial use of the $24.61 figure cited above.

The defendants argue, however, that the $24.61 figure must be discounted by over 50% for a lack of marketability and a minority discount. In part, this argument rests on their legal belief that the relevant standard in this context is not fair value, but if damages are warranted, something akin to fair market value. I agree with the defendants that fair value in the strict and jurisprudentially specific sense used in our appraisal decisions is not the governing standard in the limited partnership context.

On the other hand, in shaping a common law remedy for breach of contractual duties by the fiduciaries of a limited partnership, this court need not lose sight of equitable considerations. The current context involving the forcible squeeze-out of the Outside Investors at a price the defendants knew to be less than fair market value is not one in which steep discounts can be justified as a matter of equity. Perhaps even more important, the record does not convince me that they are justified as a matter of economics.

First, Cassiere's comparable companies analysis was already based on minority trading prices. The result he reached was, in my view, a reasonable estimate of value and therefore serious departures from it downward are not in order, particularly for adjustments for minority status. Second, because I used conservative growth assumptions and cost of capital assumptions borrowed from Cassiere, I am reluctant to pile steep discounts on top of defendant-friendly assumptions. That would be improper. Third, the justification for applying a marketability discount to Weeden is rather weak. Because the firm pays out almost all of its income every year and because its insiders have an overriding self-interest in continuing that practice, the limitations on alienability that exist are not that important a determinant of value. Unitholders are simply unlikely to want to sell out. Moreover, there remains a contractual right to transfer cash flow rights at least once, without General Partner consent, and I will not premise my decision on the General Partner's assumed intent to withhold admission rights from potential transferees or to deny transfer requests in bad faith.[47] The transfer right that exists

---

**46.** JX 363 Ex. M.

**47.** The defendants' argument that there should be a large discount because the Partnership Agreement invests great discretion in the General Partner, and that discretion might be used to compensate management at extremely high levels or to dilute unitholders enormously, is not one advanced with grace in these circumstances. It degenerates in essence into an argument that the threat that the defendants pose to unitholders themselves reduces the fair market value of the units. This economic reality, if it be that, is less than persuasive given the strong interest the defendants have in continuing to make impressive profit distributions per unit if they are going to be true to their managerial philosophy and retain their key employees.

provides an opportunity for liquidity and the likelihood of large annual returns of profits reduces economic risk.

Finally, the defendants' own actions are perhaps the most persuasive indication of value. The ardent desire of the outside directors to get the longest possible payout period indicates what a rational investor owning Weeden units would want to do: Keep them and the returns they produce for as long as possible. A look at the impressive short-term returns the outside directors received on the units they purchased for book value in 1998 provides a useful perspective on the real value of Weeden units. So too does the admission by conduct or testimony of every defendant-witness that they would not accept anything close to book value for their Weeden units and wanted the 13–year Payout for themselves.

Taking all these factors into account, therefore, I believe a minimal discount for lack of marketability of 15% is appropriate. This addresses the fact that Weeden is not publicly traded and that there are contractual restrictions on alienation but considers those factors in light of the countervailing factors detailed above. This results in a fair market value of a Weeden unit of $20.92. To put this in context, the defendants' expert, Alan McFarland, calculated that an Outside Investor subject to a ten-year payout would receive $12.83 per unit. Obviously, Outside Investors subject to immediate or shorter periods of redemption would be expected to receive even less.

The value of $20.92 needs to be further adjusted to take into account my ruling on the Dilution Claim. The parties shall calculate that difference promptly.[48]

The plaintiffs are also entitled to pre-judgment interest compounded quarterly at the statutory rate,[49] and to post-judgment interest at the statutory rate that runs on the full amount of the judgment, including the amount comprised of pre-judgment interest.[50] The parties shall collaborate on a final judgment that incorporates all of these elements and that provides for an appropriate election process for class members.

Finally, the plaintiffs have indicated their intention to apply for an award of fees and costs at a later time. The plaintiffs shall make an expedited application for an award of fees and costs so that the ruling on that application can be factored into a comprehensive final judgment, which will address all remaining issues in the case. The parties shall seek a prompt teleconference to consider how to accomplish that objective.

**48.** The plaintiffs also argued that they should receive additional damages because the General Partner retained the discretion to change the Redemption Schedule and therefore to shorten it as to the Outside Investors. In the plaintiffs' view, this provided Weeden with additional value to the Outside Investors' detriment and therefore they demand recompense. Exercising my remedial discretion, I conclude that this additional increment of damages should not be granted as an award tied to fair market value is a sufficient and fair remedy. I view the discretionary feature of the Redemption Schedule as being remedied by the fair market value damage award, which takes any risk to the Redemption Class away because they have the certainty of a monetary award or the choice of the Redemption Schedule as it was adopted, with the protection of an injunction against any change adverse to their interests.

**49.** See Doft & Co. v. Travelocity.com Inc., 2004 WL 1152338, at *12 (Del.Ch. May 20, 2004) (awarding pre-judgment interest at legal rate, compounded quarterly).

**50.** See, e.g., Brandin v. Gottlieb, 2000 WL 1005954, at *28–30 (Del.Ch. July 13, 2000) (awarding pre-judgment interest compounded at legal rate and post-judgment interest on full judgment).

## IV. *Conclusion*

For the foregoing reasons, judgment will be entered for the plaintiffs on aspects of their Dilution Claim and on their Redemption Claim.[51] The parties shall report back on their progress in crafting an agreed-upon form of final judgment within 20 days.

51. The Redemption Claim does not fairly run against defendant Steven Leuthold, who left the board in May 2000. Likewise, the Dilution Claim does not run against defendant Daniel Panker, who did not join the board until September 2000.